1809

Hamilton
vs.
Beall

Verdict and judgment for the plaintiff. The defendant appealed to this court, and on the death of the appellee, his executors were made parties.

The questions arising under the *second, third, sixth, seventh, eighth, ninth* and *tenth* bills of exceptions, were argued before POLK, BUCHANAN, NICHOLSON, and EARLE, J. by

*Martin*, for the Appellant; and by
*Johnson*, (Attorney-General,) for the Appellee.

THE COURT agreed with the General Court in the opinions expressed in the several bills of exceptions taken on the part of the defendant in that court.

JUDGMENT AFFIRMED.

JUNE.

HAMILTON vs. BEALL, *et al.*

A H, being entitled to a lot of ground, but ignorant of his right, was induced by the fraud and imposition of the agent of B B, in 1791, to execute a conveyance to B, for the lot for a small consideration. He filed his bill in chancery in 1798, to have the conveyance vacated, &c. The answers of B B's representatives, and the agent, denied all fraud, &c. *Decreed,* that as it does not appear that a fraud was perpetrated, or if it was, that B B was a contriver or privy to, or partaker of it—as the complainant suffered many years to elapse before he filed his bill—as the property hath since been greatly improved and changed, and hath devolved on several representatives—as the argument from convenience ought always to have influence, the complainant is not entitled to recover. Bill dismissed.

APPEAL from the Court of Chancery. The complainant, (now appellant,) by his bill filed on the 20th of April 1798, stated that *George Gordon,* being saized of certain lots in fee in *George-Town,* by his will dated 1766, devised the house and lot No. 48, and the *acre of land* whereon the old warehouses are erected, in fee, to his grandson *George F. Hamilton,* and lot No. 52, with the warehouses thereon, in fee, to his grandson *Charles E. Hamilton.* That after the death of the testator, *George* and *Charles* respectively entered, &c. That they both afterwards went to sea, and died intestate, leaving *Thomas Hamilton* their heir at law. That *Thomas Hamilton,* being seized of the lots devised to *George F. Hamilton,* died in 1783, without having made any valid testamentary disposition of the lots, his will not having been executed in the manner prescribed by law to pass real estate; and having died intestate as to the lots, the same descended to *William Hamilton,* who was his eldest son and heir at law. That *William Hamilton* afterwards died, having made his will in June 1786, by which the lots are not particularly devised, but if they passed by the expression in the will, it was to the complainant, and who was his eldest son and heir at law. That after the death of his father, the com-

1809

Hamilton
vs
Beall

plainant resided in *Monongalia* county, in the commonwealth of *Virginia*, and that in the year 1791, *Brooke Beall*, since deceased, (whose father had intermarried with *Ruth*, one of the daughters of *Thomas Hamilton*,) well knowing the premises, and that for want of a legal execution of the will of *Thomas Hamilton*, the lots were the property of the complainant, and intending to defraud the complainant thereof by untrue and deceitful pretences, fraudulently procured *Andrew Hamilton*, who was named executor in the will of *Thomas Hamilton*, to repair to the complainant in *Virginia*, where he resided, and by deceit and fraud to obtain a legal conveyance from him to *Beall* for the lots; and that *Andrew Hamilton*, acting by the procurement, and by the directions and with the consent and knowledge of *Beall*, falsely and deceitfully alleged and pretended to the complainant, (who was then little more than 21 years of age, and was ignorant and unlettered,) that the will of the complainant's grandfather, *Thomas Hamilton*, was good and valid in law, only that he had not thereby authorised or empowered him, *Andrew*, although appointed his executor, to sell the lots; and *Andrew* further informed the complainant, that he must give him a power of attorney for the purpose of acknowledging a conveyance from the complainant to *Beall* of the lots, which *Andrew* said he had consented to sell to *Beall*, under the will of *Thomas Hamilton*, or that the complainant must go to *Maryland* to execute and acknowledge the same, or that he (*Andrew*,) must apply to the governor and council of *Maryland* for an order to sell the lots, under a late act of assembly of that state, which *Andrew* falsely alleged to have passed, and that the complainant therefore would be obliged to attend at *Annapolis* to make valid the sale. That the complainant, being young and unlettered, and placing confidence and belief in what *Andrew*, in behalf and by the procurement of *Beall*, falsely told him, and fearing that he must either execute a conveyance for the lots, or be subjected to the expense and inconvenience of attending at *Annapolis*, as *Andrew* had falsely and deceitfully told him he must do, and being likewise without money, and his mother then ill in bed, and depending on him for assistance and support, he was induced to execute, and did, on the 7th of February 1791, execute a conveyance to *Beall* for the lots before mentioned, for the trifling consi-

deration of *three pounds ten shillings* current money, which is all that he received, and which he would by no means have accepted as a consideration for the lots, but for the imposition practised on him as before mentioned. That after the execution of the deed, to wit, in 1793, *Beall* died seized of the lots, and intestate, leaving a widow and seven children, to whom, by law, his real estate equally descended, to wit, &c. the defendants. *Prayer*, that the conveyance may be set aside and rendered null and void, &c. and for further and other relief.

The *answers* of the defendants, (one of them being an infant answered by his guardian for that purpose appointed,) admitting certain facts set forth in the bill, and their ignorance of others, stated, that *Thomas Hamilton*, claiming to be heir at law of *Charles E. Hamilton*, conveyed that part of lot No. 52, which was devised to *Charles* by *Gordon*, to *John Orr*, who afterwards conveyed the same to *Brooke Beall*, the ancestor of the defendants. That after the death of *Thomas Hamilton*, his executor *Andrew Hamilton*, offered to sell to *Brooke Beall* the lots which is the object of the bill of complaint, but on examination it was found that there was a defect in the title, and it was agreed between *Andrew Hamilton* and *Beall*, that if a good and complete title could be procured for the lots, he, *Beall*, would become the purchaser; whereupon *Hamilton* agreed to procure a title, and obtained the deed mentioned in the bill from the complainant to *Beall*, and *Beall* paid to *Hamilton* for the lots £700 or £800. The defendants deny that *Beall* ever did in any manner advise, or through false pretences persuade the complainant to convey the lots, nor do they believe that *Andrew Hamilton* took any undue means to effect that end. They refer to the conveyance, and pray that it may be taken as part of their answer; and *Beall* being a purchaser for a valuable consideration, without fraud, they contend, that neither him, nor his heirs, ought to be disturbed in their rights. That the complainant never did, as they are informed and believe, make any claim to the lots either of *Beall*, in his life-time, or of his heirs since his death, until the present application; and they are ignorant of any fraud ever having been practised on him. That since the purchase, on the faith thereof, *Beall* made valuable improvements, &c. The answer of *Andrew Hamilton*, also one of the defendants,

1809

Hamilton
vs
Beall

stated, among other things material to be noticed, that as executor of *Thomas Hamilton*, not knowing of any defect in the title, he advertised the lot or acre of ground, whereon the old warehouse formerly stood, for sale, and on the 3d of January 1791, exposed the lot at public sale, where there were several bidders, and among others *Brooke Beall*, and it was fairly struck off to him, as the highest bidder, for £225. That after the sale, the title papers were by the defendant put into the hands of *Beall*, to prepare the conveyance. That it was discovered by *Beall* that the will of *Thomas Hamilton* was defective, there not being three witnesses to it, and on that account the legal estate had descended to the complainant, who was the heir at law of *William Hamilton*. That *Beall* refused to pay the purchase money until the title of the complainant could be obtained, either to himself directly, or to some person who would convey to him; that Mr. *Gantt* was consulted as counsel, and he advised the making of a deed to *Beall* directly from the complainant, as the most proper mode of securing the title, and a deed was prepared by Mr. *Gantt*, for which the defendant paid him. The defendant afterwards, in February 1791, went to *Virginia*, where the complainant then resided, and carried with him the deed so prepared, and a copy of the will of *Thomas Hamilton*. That the defendant showed to the complainant the copy of the will, explained to him the defect, and informed him, that it having only two witnesses would not authorise the defendant to make a title to the purchaser, that the will was inoperative as to the land; that *Beall* had become the purchaser, but refused to complete the contract unless the complainant would convey the land. The defendant then showed the deed, so prepared, to the complainant, and asked him if he would execute it. That the complainant, being fully acquainted with the nature of the will, voluntarily, and without any hesitation, agreed to convey his title to the property, and to execute the deed to *Beall*. That the defendant had also a power of attorney prepared to have the deed properly acknowledged by some person in this state; but the complainant informed the defendant, that he wished to make a visit to his uncle *John*, who resided near *Shepherd's* town, and *Allegany* county being on the road, he would, on his way through that county, execute and acknowledge the deed; which was accordingly

done on the 7th of February 1791. That the complainant and defendant were in company together for several days after the execution of the deed, and conversed respecting it, and the complainant expressed himself satisfied with its execution. When the defendant saw the complainant several years after; he did not express any dissatisfaction at having conveyed the land to *Beall*. The defendant denies that he ever told the complainant that the will of *Thomas Hamilton* was good and valid in law; but on the contrary informed him that it was defective and inoperative to pass land, or give any power or authority to affect the same. He also denies that he ever informed the complainant that he would apply to the governor and council, &c. and denies the other allegations stated in the bill, of fraud, deception, &c.

*Testimony* was taken under commissions, and the cause having been argued and submitted,

HANSON, Chancellor, (24th September 1805,) stated, that whether he shall decide in favour of the complainant, or in favour of the defendants, the case must, to every candid person, appear hard for the loser, and most probably litigation will be continued as far as possible to the great expense, trouble, and anxiety of both parties.

In various cases of doubt or difficulty, or hardship, the chancellor has thought proper to recommend a compromise and decree by consent, and experience has convinced him that he is right. He considers this case peculiarly proper for a settlement in that way. He has never had before him a case concerning the merits of which he more doubted, and of the event of which, after his decision, doubts might more reasonably be entertained.

Acting on principles which have always governed him, and led by those principles to consult the welfare, as far as his power extends, of every suitor in this court, whose conduct has not, in his opinion, deserved punishment or reprobation, he proposes an adjustment, such as he believes an intelligent, careful, impartial arbitrator would award. Such as cannot be greatly detrimental to the party, who shall be finally victorious, in case this proposal shall be rejected, but which, in such case, will have been beneficial to the other party.

Let the parties, by writing here filed, consent to a decree to the following purport, viz.

1st. The defendants, heirs of *Brooke Beall*, shall on or before the 25th day of March next, pay or bring into this court, to be paid to the complainant, the sum of 800 dollars; and in case that sum shall not be so paid, or brought in, the payment thereof, with interest, may be enforced by execution on the persons or property of the defendants.

2d. The complainant shall execute and acknowledge, according to law, a release to the defendants of all his right, legal or equitable, to the property in question.

3d. Each party shall bear the proper costs.

This recommendation of the chancellor was not acceded to, and he then passed the following decree:

The defendants having rejected the chancellor's recommendation, it becomes incumbent on him to determine as a judge, wholly in favour of them, or of the complainant, according to the best of his judgment, and knowledge of the principles of this court, and not, as he wishes he were authorised to do, in the spirit of a fair, impartial, intelligent arbitrator.

Under the *special circumstances* of the case he may not speak so largely as it is customary for him to speak in decrees of importance. But he will say thus far—As he is not satisfied that a fraud was perpetrated, or even if it was, that *Beall*, the purchaser, was a contriver, or privy to, or partaker of it; as the complainant suffered many years to elapse before he filed his bill; as the property hath since been greatly improved and changed, and hath devolved on several representatives; as the argument from convenience ought always to have influence, he cannot think the complainant entitled to relief.

It is true that some of those reasons would, if standing alone, be entitled to little or no weight, but when united they appear to form a sufficient and firm prop or support for the defendants.

Were indeed the chancellor fully convinced from the evidence, that, before the complainant executed the deed, there were, between him and *Andrew Hamilton*, transactions which this court must consider as constituting a fraud on the part of *Andrew*, the circumstances herein stated as reasons would not induce the chancellor to refuse relief. Consider too, the rule respecting the refutation of an answer—examine the answer and evidence in this cause together—compare the testimony on each side—consider, as

we must do, when witnesses differ, whose testimony is most probable—consider even if the complainant's witnesses are correct, and their testimony is to prevail against the answer and opposing testimony, how far ignorance should protect a man in this court. If one party shall tell the other a most improbable story to intimidate—For instance, if A tells B, a plain common farmer or planter in *Virginia*, "if you will not execute this deed, the governor of *Maryland*, in virtue of a law of his state, will send for and compel you." If the farmer be not half an ideot or a lunatic, or in a state of mental imbecility, it must be difficult for even *three* witnesses against a defendant's answer, to satisfy the mind that A's declaration has induced the farmer to make the conveyance. The testimony of those who swear to *Andrew Hamilton's* declarations must be unsatisfactory; their memories must be defective; if not, it may be demanded, wherefore did they stand by and permit the falsehood to have its effect?

If ignorance were by this court protected to that extent, how many fair contracts might be set aside! Ignorance indeed, real or pretended, might in many instances have the advantage of knowledge and wisdom. In the chancellor's opinion, on a view and comparison of all the proofs, there has not in this case been that *suggestio falsi, aut suppressio veri*, which can authorise him to grant the relief prayed by the grantor in the deed against fair purchasers, who have long been in possession of, and improved the property, before a demand of any kind made of or against them. *Decreed*, that the bill be *dismissed*, but as the complainant had probable grounds for instituting the suit, it is dismissed without costs. From this decree the complainant appealed to this court.

The cause was argued before Chase, Ch. J. Polk, Buchanan, Nicholson, and Earle, J.

*Johnson*, (Attorney General,) and *Magruder*, for the Appellant, cited 1 *Fonbl.* 189. 1 *Pow. on Cont.* 140, 144. *Broderick vs. Broderick*, 1 *P. Wms.* 239. 2 *Pow. on Cont.* 156. *Evans vs. Llewellin*, 2 *Bro. Chan. Ca.* 150. *Brogden vs. Walker's Ex'r. &c.* (ante 285.) 2 *Fonbl.* 158. *Jennings vs. Moore*, 2 *Vern.* 609. *Blenkarne vs. Jennings*, 1 *Bro. Parl. Ca.* 244; and *Doe vs. Martin*, 4 *T. R.* 66.

*Martin* and *Shaaff*, for the Appellees, cited 1 *Fonbl.* 115, 189, *(note,)* 384; and *Pasley vs. Freeman*, 3 *T. R.* 51.

DECREE AFFIRMED.

1809.

Reinicker
vs
Smith

---

REINICKER vs. SMITH.

SMITH vs. REINICKER.

JUNE

CROSS APPEALS from a decree of the Court of Chancery. The complainant, *(Reinicker,)* filed his bill of complaint against the defendant, *(Smith,)* stating that *Thomas Franklin*, being seized of a lot of ground in *Baltimore*, agreed to sell all his interest therein to the complainant for the consideration of £112 10 0, which agreement was reduced to writing, and is evidenced, by the bond of conveyance exhibited, dated the 20th of March 1794. That the consideration money has been fully paid. The bill further stated, that *Benjamin Franklin*, brother of *Thomas*, afterwards claiming to be possessed of an interest in the premises, agreed to transfer and convey the same, absolutely, to the complainant, for the consideration of $300, which agreement was reduced into writing, and is evidenced by the bond of conveyance, exhibited, dated the 29th of July 1794. That the consideration money has been fully paid; and the complainant, ever since the execution of the two bonds of conveyance, has been in the quiet, secure, and unmolested enjoyment of the premises. That *Thomas* and *Benjamin Franklin* are both since dead, and that *Sarah Smith*, the defendant, is seized and possessed of the inheritance and legal estate in the premises, by right of descent, and as heiress at law. That the complainant has frequently applied to her for a deed of conveyance of the premises, which she has refused to execute, and has instituted actions of ejectment for the recovery of the possession of the premises. *Prayer* for a specific performance of the agreements, and a deed of conveyance of the premises, and for an *injunction*, &c. The *answer* of the defendant stated, that her brother, *James Franklin*, was in his lifetime seized and possessed, and died seized and possessed, amongst other real estate, of the lot of ground mentioned in the bill, on the 31st of December 1793, intestate, leaving a sister, (the defendant,) and two brothers, *Thomas* and *Benjamin*, before named, and which two brothers, and the defendant, on the death of *James*, became, under the act to direct

*T F. and B F, being seized as tenants in common under the act to direct descents, with S S, of and in (among others,) a lot of ground, contracted separately with G R, and agreed to convey to him all their interest therein, on the payment to each of them of $300; and the money being paid, possession of the lot was delivered to G R, who after the death of T and B F, filed a bill in chancery against S S, she being their heir, for a specific performance of the contract. S S, by her answer, alleged that both T & B F were in habits of intemperance, and were almost constantly in a state of intoxication. That the lot was contracted to be sold by them when in a state of intoxication, or when they were incapable of transacting business, at a price greatly below its value, &c.—Decreed, that S convey to G R, one undivided third part of the lot of ground; but as to the contract of B F, on account of the satisfactory proof of his imbecility, it ought not to be enforced; and that G R deliver to, or permit S S to take or enjoy two undivided third parts of the lot of ground, without her refunding the consideration paid by him to B F A tenant in common, under the act to direct descents, may dispose of his interest in any particular portion of the estate so held in common*