HOLLISTER *vs.* C. and J. P. LOUD, JOHNSON & HIGBY.

A voluntary deed of assignment for the benefit of creditors, containing covenants on the part of the assignees or trustees, and stipulations beneficial to the creditors, is, in law, to be deemed and taken as founded upon valuable consideration; and the assignee is in such case, in legal contemplation, a purchaser for a valuable consideration.

The actual secret intent of the assignor, however bad, cannot affect a bona fide purchaser without notice.

A conveyance is not void for fraud, because its effect is to hinder, delay, and obstruct creditors. To render it so, it must be made with that *intent.*

The fraudulent intent of a grantor'should be clearly established by proof. It will not be sufficient to deprive the grantee of his deed, that the grantor suffered the bill to be taken as against him *pro confesso,* especially where the grantee expressly denies all knowledge of his grantors fraudulent intent.

It is no objection to the validity of an assignment, that it was made in anticipation on the part of both assignor and assignee, of the immediate issuing of attachments against the property of the assignor.

The fact that the assignees suffered one of the assignors to occupy premises conveyed in the deed of assignment, during a period when such property was not usually rented, the assignees in the meantime taking the crops, and expressing their intention to charge the assignor occupying the premises, the fair rent, in the absence of any understanding that he should occupy them free of rent, cannot be urged as evidence of a secret trust on behalf of the assignor.

It is no objection to an assignment that no time is limited by it for closing the trust.

When the provision is, that the assignees shall proceed to sell the property and pay the debts within such time as to them shall seem meet, it puts the execution of the trust under the control of the Court of Chancery, which will compel the assignee to use reasonable diligence.

It has never been held a valid objection to an assignment, for creditors, except in connection with other proofs or badges of fraud, that no schedule was annexed to the deed at the time of its execution.

An assignment reserving property exempt from levy and sale on execution, is not for that reason, void. The same rule held in England, under the statute, (13 *Elizabeth,*) that to make a voluntary assignment void as to creditors, it must embrace property subject to be taken on execution for the payment of debts, and that the statute was not intended to enlarge the remedies of creditors, must prevail in this State.

It cannot be objected to an assignment of this kind, that it provides for the private creditors of the individual members of the firm, where the individual property of the members included in the assignment, exceeds the amount of each one's individual debts.

Fraud must be distinctly and clearly made out, and cannot be inferred from circumstances of an equivocal tendency. It is not to be lightly presumed, after a denial in the answer, nor to be inferred upon slight evidence. It is not to be considered as a single fact, but as a conclusion drawn from the circumstances. (*Vide Manning* vs. *Pierson, post.*)

Appeal from the Jackson Circuit Court, in Chancery.

The complainant and appellee, a judgment creditor of two of the defendants and appellants, C. and J. P. Loud, filed his bill to set aside as fraudulent, a voluntary assignment, purporting to be general, and with preferences, made by the two Louds who were co-partners, to the other defendants and appellants, Johnson and Higby, so far as said assignment operated as a conveyance of real estate in the counties of Jackson and Eaton. The assignment was drawn by the defendants Johnson and Higby, attorneys of the assignors, for that purpose, on Sunday, 21st October, 1849, and executed and acknowledged on the

day following. The schedule of the assigned property was made out in some two weeks, but not actually attached to the assignment until in January following, although in the hands of the assignees, together with the assignment, in the meantime. The assignment by its terms, in consideration of one dollar and the covenants therein contained, on the part of the assignees, purported to convey all the property of the assignors owned by them jointly or severally, except such property as was by law exempt from levy and sale on execution. It provided that the assignees should forthwith take possession of the property and with-in such reasonable time as to them should seem meet, convert it into money, and *Firstly*, Pay in equal proportions the several debts due and owing from the assignors, *either jointly or individually*, to certain creditors named therein, most of whom were residents of Jackson county, and generally all creditors in said county whose demands did not exceed one hundred dollars, one Amos Root being included in the first class, in compliance with a request of the assignees, who had been pre--viously spoken to by said Root in reference to their collecting or secu-ring his demand: *Secondly*, That the assignees should pay out of the residue of said property, in equal proportions, all the other creditors, *except the complainant* and certain creditors specially excepted: *And thirdly*, That out of the residue of said property, the complainant and other creditors, specially excepted out of the second class should be paid in equal proportions. The complainants having perfected judg-ments against the Louds on or about the 13th of January, 1850, sued out writs of *fieri facias* thereon, which were severally levied, one on the lands in Jackson and the other on the lands in Eaton county, inclu-ded in the deed of assignment. Before writs issued, the assignees had taken possession of all the property, sold the personal property, and the real estate was advertised by them for sale. At the time of making the assignment the assignors were apprehensive that the complainant would sue out attachments against them forthwith. Caleb Loud, one of the assignors, was permitted to remain on part of the real estate assigned, up to the time of filing the bill, but the assignees had taken all the crops from the premises and intended to exact from him the fair rent of the premises. The bill was taken as confessed by the de-fendants, C. & J. P. Loud. It was answered by the defendants John-

son & Higby, denying the fraud and all knowledge by them of any fraudulent intent in the Louds. The cause was brought to hearing in the Court below upon pleadings and proofs taken in open Court as to the two last named defendants, and upon the bill taken as confessed by the Louds, at the December term of the Jackson Circuit, 1850, before his Honor, Judge Pratt, and a decree made, in pursuance of the prayer of the bill, declaring the assignment fraudulent and void as against the complainant, and from that decree the defendants Johnson & Higby, appealed to this Court.

*Johnson & Higby,* appellants in person.

*N. H. Joy,* for appellee.

By the Court, WING, P. J.

The complainant by his bill seeks to have the assignment set aside and declared void, as having been made to hinder, delay or defraud creditors.

Our statute of 1846, page 328, section 1, provides that "any conveyance or assignment, &c., made with the intent to hinder, delay or defraud creditors, &c., as against the person so hindered shall be declared void." Section 5 provides that "none of the provisions of this act shall be construed in any manner to affect or impair the title of a purchaser for a *valuable consideration* unless it shall appear that he had previous notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor."

As between the grantors and the grantees the deed is good and passes the title; but it is denied that the indebtedness of the grantors to their creditors, or the nominal consideration of one dollar, or the covenants on the part of the grantees, either or all, constitute a valuable consideration. But such trust conveyances containing covenants on the part of the trustees or assignees, and stipulations beneficial to the creditors, are to be deemed and taken as founded upon a valuable consideration. The assignee therefore, is in legal contemplation a purchaser for a valuable consideration, and becomes vested with the legal estate in the property assigned. (2 *Johns. Ch. Rep.,* 189; 10 *Pick.,* 413; 2 *Kent's Com.,* 533; *Roberts on Fraud. Conv.,* 434; *Gorham*

vs. *Reeves*, 1 *Smith Indiana Rep.*, 239.) It is upon this principle that all assignments to trustees for creditors have been sustained. The trustee does not actually buy the property and pay for it.

It must be shown then, by the complainant, that the parties to the deed, entered into it as a device for the purpose of hindering, delaying or defrauding the creditors of the grantors; that it was not intended by the parties to it, and especially the assignors, to carry its provisions into effect, bona fide, but that it was intended as a means to keep the property from the creditors, or this creditor in an especial manner, and from motives of malice or guile, or that the deed of assignment contains provisions or trusts which are prohibited by law, on account of which, it is to be deemed fraudulent and void. *The actual secret intent of the grantor, however bad, cannot affect a bona fide purchaser, without notice.* (Astor vs. Wells, 4 *Pet. Cond. Rep.*, 513; Wheaton vs. Sexton, 4 *Pet. Cond. Rep.*, 519; 11 *Pick.*, 50; 1 *Johns. Rep.*, 30; 5 *Pet. Cond. Rep.*, 344; 6 *Ib.*, 223; Gorham vs. Reeves, 1 *Smith's Indiana Rep.*, 239.)

As to the intent, the Editor of the American Leading Cases, in a note to the case of Salmon vs Bennell, 1 Vol., page 54, says these attempts to reduce fraud in all cases, to a matter of actual intent, is not only opposed to all principle and authority—to common justice and to common sense, but has been frustrated by the very forms and constitution of the Courts, and cannot be successful until the respective functions of the judge and jury are changed; for the Court obviously possesses the same control over the subject in the form of a direction to the jury, as to the force of presumptions on a question of fraudulent intent, as they formerly exercised through the medium of a peculiar definition of fraud; and to prevent irregularity and injustice this control must be exercised, and this practice is established by Vance vs. Philips, (6 *Hill*, 433.) In Chancery, however, there used to be no practical difference between the present and the former rule or law. This Court, sitting in Chancery, exercises the functions of judge and jury at law. We will therefore proceed in the first place, to an examination of the evidence, independent of that which is contained in the deed.

The fact that the assignors and assignees were informed of the intention of the complainant to sue out a writ of attachment, the next day,

40

for the purpose of seizing the property of the grantors, is dwelt upon with great earnestness by the counsel for the complainant, as evidencing an intention by both parties to the deed, to forestall and defeat the legal remedy of complainant. The force of the argument on this point must depend upon the right of the assignor to make, and of the assignee to receive, a valid assignment under such circumstances. It is a maxim of the common law, that *vigilantibus non dormientibus leges subvenient,* but the rule of equity Courts is, that equity is equality, and a distribution of a debtors property among his creditors is particularly favored in those Courts. It is upon the principle of the common law maxim that complainant makes his claim, and insists that the assignment is void; and that he being the most vigilant creditor, is entitled to have the property conveyed by the assignors, appropriated to the payment of his debt; and yet, the equities of both parties are equal; the one is a creditor, and the other represents creditors.

It is said, assignments to trustees for the benefit of creditors, are an invention of comparatively modern origin. Courts of law said the principle of such assignments trenched upon the fundamental maxim of the common law, and that it was apparently repugnant to the very wording of the statute of frauds; but the rule of the Chancery Courts, that *equality is equity,* prevailed over the common law principle, and the Courts permitted the debtor to arrest the diligence of one creditor, in order to provide for the interest of all. (*Tracy, Senator,* 11 *Wend.,* 216.)

Acting upon this principle, it has come to be an established rule of law in this country and in England, which is sustained by a train of decisions in the Courts of both countries, that a debtor in failing circumstances, may, in the absence of any existing lien, make a conveyance or assignment of the whole of his property for the benefit of a single creditor, in exclusion of all others, or he may distribute it in unequal proportions, either among the whole or a part of his creditors. (4 *Mason's Rep.,* 210; 15 *Johns. Rep.,* 583; 5 *Cow.,* 547; *Nevin* vs. *Nillsmore,* 8 *T. Rep.,* 521; *Estwick* vs. *Caillard,* 5 *T. R.,* 402; 4 *East,* 1; *Small* vs. *Oadly,* 2 *Pr. Williams; Phœnix* vs. *assignee of Ingraham,* 5 *Johns. Rep.,* 412, '26, '27; 3 *Ib.,* 85; 5 *Ib.,* 544; 2 *Ib.,* 307; *Nicoll* vs. *Mumford,* 4 *Johns. Chy. Rep.,* 526, '7; 1 *Binney,* 502.)

The fact that this class of conveyances is often resorted to in this country, and the further fact that in much the largest portion of them, what are esteemed unjust preferences, are made, and secret trusts are created for the benefit of the debtor, has occasioned a great and growing prejudice against them; and this may have been increased in this State, by the fact that the rules which the caution of Courts had established, and by which certain things which were held to be badges of fraud, and others which were deemed conclusive evidence of fraud, have been changed by statute, and a more lax rule established, by which a question of fraud is made a question of *fact*, and not of *law*. But until some other mode is devised, which promises greater security for the interests of creditors generally, than this system affords, it must and will prevail. Every safeguard which the statute or common law has thrown around our persons and property, may be abused, and that which was intended as a shield for protection, may be made a weapon of offense, and an engine of mischief in the hands of bad men. But not for this reason should we abandon all trust in the law or in men, and cease to be governed by fixed legal principles. "Men have differed, and will continue to differ as to the benefits or expediency of this scheme; but it is thought to be the better opinion, that in the absence of a general bankrupt system, the interests of a commercial community require that they should be sustained. They have accordingly grown into use, and have been sanctioned by judicial decisions in most of the States of the Union, and have become thoroughly incorporated into our system," and consequently the force of the legal maxim which we have quoted, must be held in subjection to the equitable rule.

In this State, every man has the *jus disponendi* of his property, unless it is subject to either an equitable or legal lien. It makes no difference that he is in failing circumstances—that suits are threatened or are pending—that judgments exist against him, nor that executions against him are in the hands of an officer and a levy is momentarily expected, but not made. Under any or all of these contingencies, he has the full and absolute right to dispose of his property. He may pay his debts with it. He may exhaust all his property in paying one creditor, leaving another unpaid, and lastly, he may assign his property to trustees for the benefit of creditors; provided always, that he does it,

bona fide, and without any intent to hinder, delay or defraud them. This will fully appear from an examination of the authorities we have cited.

If the effect of a conveyance be to hinder, delay or obstruct creditors, it is not therefore void. The statute was not designed to restrict the right of a debtor to pay his creditors, whom moral duty and a sense of justice may dictate the propriety of paying or securing, or from doing equal and exact justice to all. " Every conveyance of any part of the debtor's property may have the effect in a greater or less degree to hinder and delay creditors, as it withdraws from their legal grasp the means, *pro tanto*, of coercing their debtor." To render it fraudulent, it must be done with the intent to hinder, delay or defraud, but if made with no such intent, but with• honest motives and with the higher or nobler intent and purpose of paying all equally or of providing for those who are the most meritorious, it will be sustained.

In the case of Pickstock *vs.* Lyster, (3 *Maule & Selwyn*, 371,) Lord Ellenborough says, in speaking of assignments made with a view to an equal distribution of the debtor's property, that it was to be referred to an act of duty rather than of fraud, when no purpose of fraud is proved. The act arises out of a discharge of the moral duties attached to the character of the debtor to make the fund available for the whole body of the creditors. Bailey, Justice, says this conveyance so far from being fraudulent, was the most honest act the party could do. Not having sufficient to pay all his debts, he proposes to distribute his property in liquidation of them. In Eastwick *vs.* Caillard, Lord Kenyon said " it was neither illegal nor immoral to prefer one creditor to another."

The object of the statute was not to prevent such conveyances as might operate to hinder or delay creditors, but only such assignments as were in their *inception* and *intention* fraudulent and void. It is the fraudulent intention, the *mala mens*, with which the conveyance is made that constitutes the fraud against which the denunciations of the statute are directed.

We have made this somewhat extended statement of the history of assignments and the principles upon which the decisions of Courts in this class of cases are founded, for the purpose of ascertaining our true

position and of establishing the point from which these transactions are to be viewed, and from which we are to start, in entering upon an investigation of this case. We are satisfied from the scope and spirit of the decisions, that such transactions should be closely scrutinized and regarded with distrust.

It is a remarkable fact in this case, that the assignors, who are charged with having violated the law, and who were made parties to the bill by a personal service of the subpœna, should have suffered it to be taken as confessed against them. It is not often that persons who have made assignments, allow such charges to be placed upon the record without an explicit denial of them. Still less frequent is it, that the grantors in such deeds, confess their iniquity to their creditors, whose legal remedy has been delayed or defeated by it, (as is charged in this bill.) It indicates that the assignors have changed sides, either in consequence of some dissatisfaction with the assignees, or their creditors. The personal property it would seem, was sold immediately after the assignment was made—when the executions were issued in January, it had all been disposed of, and the real estate had been advertised for sale. There seemed to be but little chance for them to derive any benefit from the assignment, as the assignees were rapidly closing up the trust. This bill was filed in February following. The admissions of the assignors, by their *pro confesso*, were made in legal contemplation, sometime in March or April. In the meantime, the complainant or his solicitor, had seen and conversed with the assignors, when they admitted (as the bill charges) that the assigment was made to hinder, delay, &c. The assignors were sworn as witnesses in the case, in behalf of the complainant.

It would have been competent for the complainant to compel the witnesses to disclose every fact or circumstance tending to show the intent by which the parties in the assignment were governed; it would naturally be expected that the complainant would have exercised his ingenuity in compelling a full development of the plans of both parties in all their details. The fact that they asked so few questions and those of a character so general, is perhaps evidence that they did not know or suspect any other matter or fact not disclosed. The assignors may have been willing that the bill should have been taken *pro confesso* against them, and at the same time unwilling to confirm

by an oath what was thus formally admitted. The witnesses give no intimation of any intent on their part beyond a desire to devote their property to the payment of all their debts. It is upon the force and effect of this *pro confesso* that the complainant relies for proof . of the intended fraud. We however, think that but little dependence can be placed upon this kind of evidence, under all the circumstances. In the case of Hildreth *vs.* Sands, (2 *Johns. Ch. Rep.*, 35, 43,) a bill was_ taken *pro confesso* against the assignor charged with a fraudulent intent to hinder creditors, &c. Chancellor Kent remarked: "In the present case it would be too rigorous to deprive the grantee of his deed, however innocent he might be, upon the mere fact that the grantor suffered the bill to be taken *pro confesso*. This might have happened from collusion with the plaintiff, or from ill will to the grantee, and although no such motive is to be suspected in the present case, yet before the above principle is to be applied, I should say there ought to be more evidence of the fraud than mere implied admissions of a co-defendant who neglects or refuses to answer." The evidence of these witnesses is substantially the same as the answers of the assignees as to the circumstances attending the making of the assignment. We therefore think that this last description of evidence does not tend to throw any light upon the character of the original transaction; especially in connection with the explicit denial of the assignees of any knowledge of an intended fraud by the assignors. They deny their belief of such intention, and they also deny that they had any intention to effect such a purpose by any agency or participation of theirs in the transaction, from the beginning to the end of it. Whatever the secret intention of the grantors may have been, they were not disclosed to the assignees. They offered no inducement to have the assignment made, they did not urge it, and they seem to have finally yielded to the solicitations of the assignors to accept the trust. The creditors knew nothing of the transaction, and it does not appear that the assignees were the attorneys of any of the creditors. It seems a Mr. Root had before spoken to Mr. Johnson to get his claim secured, but it does not appear he undertook to act for him, as Root was put in the first class of creditors to be paid.

In almost every case to be found in the books, the debtor is stated to have been alarmed by the vigorous pursuit of his creditors, by means of legal proceedings, and in many of the cases he is reported to have stated his apprehensions to some friend, disclosing the fact that he expected executions out against him, and after disclosing his apprehensions, he has made his confidant his assignee. This was the case in 4 East., 1; in 5 D. & E.; 7 Wheaton, and 1 Binney, cited above; and yet the assignments were held valid. Something more must appear—something like malice, covin, collusion or guile, must be manifest from the transaction taken together, before fraud can be found by a jury or a Court.

The fact that the assignment was made on Sunday, was treated by the counsel of complainant in his argument, as an indication of a fraudulent intent. It certainly indicates that the assignors were in a hurry to finish the assignment before an attachment could be sued out. It was not executed on Sunday, and not until early the next morning. It was expected the attachment would be sued out and levied in the morning of the next day.

It is not charged that the transaction was veiled in secrecy, or that it was not generally known the next day. If complainant had intended to take out an attachment the next day, why did he not do so? Most probably he knew the assignment had been made, for the assignees took immediate and open possession of the property. The fact that they allowed Caleb Loud to remain on the farm up to the time the bill was filed, and during a period when houses and farms are not usually rented, adds nothing to the force of the proof, as the assignees in their answer, say they suffered him to remain until they could find a purchaser for the farm, which was advertised for sale. They took the wheat crop off from the farm, and but a very short time elapsed before they were enjoined. They say they intended to collect the fair rent of the farm, and there was no understanding that Caleb Loud should occupy it free of rent. Under such circumstances it can hardly be said, that a failure on the part of the assignees, to do that which might have savored of rigor towards the assignors, should be urged as evidence of a secret trust in his behalf. The fact that complainant's suits at law, then pending, were continued from time to time till early in January, some three

months after the assignment, and upon the oath of the assignors, seems to have very little if any bearing upon the case. If the suits which had before been continued from July to October had then been permitted to go undefended, it might have occasioned some suspicion. The assignees were bound to defend the suits if there was a good ground of defense to them, (and it is not alleged there was not,) and finally it was their duty to abandon the defense if they could not obtain the attendance of witnesses. There are no facts proved in relation to this matter, besides those we have rehearsed. There is no proof of the charge that the parties to the assignment preferred their creditors in Jackson county, for the purpose of securing their friendly aid in sustaining the assignment; nor is there any proof that it was done at the special instance, or by the influence of the assignees. The evidence shows that the assignors suggested the name of Mr. Holmes as assignee, but Messrs. Johnson and Higby advised them that he was not a man of sufficient character or influence. What kind of a man he was does not appear. Upon this suggestion being made, the assignees solicit Johnson & Higby to take the assignment, and they at last agreed to do so.

That the Jackson county creditors were preferred, appears upon the face of the assignment; but the reason for this being done is not shown. The fraudulent motive assigned in the bill for this act is fully denied by the assignees, so far as they had any knowledge on the subject. This charge is urged in connection with the fact that complainant is placed in the third class of creditors, and that he is expressly excepted from the second class. This exception may have been made, as the most convenient way of designating those who were to be included in the second class, as those who were excepted were much less numerous than those that were included in that class.

The principle upon which Courts are supposed to have acted, in sanctioning assignments for the benefit of creditors, is, that it enables a debtor to distribute his goods equally, among them; this approaches the nearest to the mode of distribution which prevails under bankrupt laws. But it is singular, as remarked by Senator Tracy in the case of Grover *vs.* Wakeman, (11 *Wend.,* 217,) that where the right of an insolvent to lock up his property from the legal pursuit of one creditor by a deed

of assignment, was put upon the principle of securing its equal distribution among all his creditors, that it was immediately extended so as to embrace and combine with it another and completely contradictory principle, that of preference among creditors; but so it is, that voluntary assignments which were first allowed, to prevent inequality in the distribution of an insolvents assets, are now resorted to as a most efficient means for securing this inequality. If it be true, then, that the assignors exercised this undoubted right, no prejudice can result to the assignment, from the fact that complainant's demand was put into the third class, unless an inference of malice or collusion can be drawn from it, connected as it is with the fact that the complainant was vigorously prosecuting his claim at law. The comparative merits of his claim are not made to appear. We are not informed that the preferred claims were not the most meritorious. That a preference should be given to those persons having claims growing out of confidential neighborhood dealing, such as debtors usually feel it to be their duty to prefer and secure, when they find that their property must go, has always been commended by Courts, and has usually been considered just. (See *opinion of Chief Justice Thompson, in Riggs* vs. *Murray,* 15 *Johns. Reports, and the opinion of Judge Sutherland,* 11 *Wendell,* 200, 201.) Complainant was a merchant who charged profits on his goods. He may have been unfair in his exactions, though it does not appear that he was so. The assignors had the means of judging of these matters, and the right to discriminate between creditors has been fully sustained. If it is urged as an evidence of fraud that the pursuing creditor is not named in the first class, but is put off to the third class—if this is of itself a badge of fraud, then a new rule or badge of fraud is introduced into the law, which controls the right of preference. Whatever the motives might have been, which induced the preferences stated in the assignment, Courts do not, and cannot question the right to make them. (11 *Wend., cited above;* 2 *Kent Com.,* 335.)

Again, it is urged as an objection to the deed of assignment, that no time is limited by it for closing the trust. The provision in the deed is, that " the assignees shall forthwith take possession, &c., of the property, and within such reasonable time as to them shall seem meet, convert it into money, and pay, &c." This provision, whilst it does not restrict

41

the trustees to an unreasonably short period, does not give them an unreasonable time. It puts the execution of the trust under the control of a Court of Chancery, which will compel the trustee to exercise reasonable diligence. (17 *Sergt. & Rawle*, 251; 6 *Mass. Rep.*, 343; 8 *Pick.*, 559.)

It is objected to the validity of the assignment that no schedule was annexed to the deed, at the time of its execution. We have seen that this matter is fully explained by the answer and proof. Except in connection with other proofs or badges of fraud, this objection has never been held to be sufficient, and it is does not constitute a link in the chain of evidence, where it is as fully explained as in this case. The property vested in the assignees at the delivery of the deed, whether the schedules were perfected then or not. (1 *Sandford Superior C. R.*, 4; 2 *Ed. Ch. R.*, 264; 6 *Mass.*, 339; 4 *Wash. C. C. R.*, 232; 1 *Binney*, 523; 15 *Conn.*, 132; 2 *Paige*, 311.) If the assignors had failed to make the schedules, a Court of Chancery, on a bill of discovery, would have compelled them to disclose and deliver up the property.

It is objected also, that the assignors direct that the balance remaining, if any there should be after all the debts were paid, should be paid over to the assignors. This does not raise a suspicion of fraud in this case. A case might exist in which it would have an important bearing, as for instance, if an individual creditor of a firm should complain that the property of a partnership which was considerable was assigned to pay a small amount of debts, and was tied up in the hands of a trustee until all claims against the firm were paid. This would postpone the individual creditors. (See 9 *Paige*, 302.) Hence the individual creditors are in the first class. After all the debts are paid there would be a resulting trust, and a Court of Chancery would compel the trustees to account and pay over to the assignors. (9 *Paige*, 302; 8 *Watts & Sergeant*, 304; 11 *Wend.*, 235; 7 *Cow.*, 735; 5 *Watts & Sergeant*, *Dana* vs. *U. S. Bank*,) where this subject is much discussed.

Another ground of objection is that the assignors reserved from the general mass of the property, *such of it as was by law exempt from levy and sale on execution.* This question has been raised under the statute of 13 Elizabeth. It is the settled law in England, that to make a *voluntary conveyance* void as to creditors, it must embrace property

subject to be taken on execution for the payment of debts. It is held there, (as it must be here,) that the statute was not intended to enlarge the remedies of creditors. That would be a strange anomaly, (says Judge Story in 1 *Eq. Juris., sec.* 367,) to declare that to be a fraud upon creditors, which in no respect varied their rights or remedies. We cannot perceive why this same doctrine should not apply as conclusively to a conveyance which withholds property from creditors which is not subject to execution, and which is expressly and in all contingencies saved to the debtor by statute law.

As to the property which was for the time being withheld, and which was allowed to the assignors by the assignees, as being exempt by law, we say, if the property was not exempt, it at the least was assigned and vested in the trustees. The assignees must settle that question with the assignors. The creditors will hold them responsible, if the property was not exempt; it was not done secretly—the parties attempted to act under the law.

It is also objected that the private creditors of the individual members of the firm are included in the assignment, when all the property assigned is alleged to have been the avails of the partnership business, and to have belonged to the firm. The assignees say in their answer, that they do not know that there are any private debts of either of the parties. The assignors in their evidence, state that they owed some small debts; but judging from their statements, the amount was very inconsiderable. The answer of the assignees, and the evidence of the witnesses, establish the fact that a considerable portion of the real estate assigned, including town lots, houses, and a farm, belonged to the individual members of the firm; the witnesses say it was bought with the avails of the partnership business, but it was their separate, private property. The fact that those lots were purchased with funds derived from the partnership, does not make it partnership property. Partners frequently draw from the stock of the firm their several portions of the profits, and make purchases for their own private use, and if they should assign it to pay the debts of the firm, the private creditors might complain, and ask the aid of a Court of Chancery to appropriate it to the payment of their debts. In this case the private real estate was not used by or devoted to the use of the firm. Of the land, the parties

held together, they were tenants in common, and each one owned a moiety as his individual property. (*Coles* vs. *Coles*, 15 *Johns. Rep.*, 159; 11 *Mass. R.*, 469; *Goodwin* vs. *Richardson*, 2 *Edw. Ch. Rep.*, 28.) We cannot see that the creditors of the firm were injured by the individual creditors being included in the assignment, as the private property assigned by each partner, exceeded his private debts, and the individual partners could not complain, as they were embraced among the preferred creditors. Upon what principle can the partners claim that the several partners were bound to give up their private property for the benefit of partnership creditors, to the exclusion of their private creditors? Both sets of claimants were alike meritorious. It is not charged that this private property was purchased after the partnership debts were contracted. The partners could have no claim as against each other, that the private property purchased with partnership funds, should be devoted to the payment of partnership debts. There does not appear to have been any unauthorized appropriation of the funds of the firm, to private uses. What each partner took, seems to have been taken by the mutual assent of both of them.

We have thus examined with some degree of minuteness all the evidence in the case, as well that which is furnished by the depositions of the witnesses and the answers of the assignees, as the provisions contained in the deed of assignment itself, and we have been unable to find those evidences of fraudulent intent on the part of the assignors, which, in any of the cases we have read, have been held to be conclusive or strong evidence of fraud.

This Court held in the case of Buck *vs.* Sherman, (2 *Doug. Mich. Rep.*, 176,) that fraud will not be presumed upon slight circumstances, the burthen of proving it will rest upon the party charging it. The Chief Justice, in delivering the opinion of the Court, said: "The proof should be so clear and conclusive as to leave no rational doubt upon the mind." It is said in 8 Cowen's Rep., by Woodworth, Justice, that fraud may be presumed in equity from circumstances, though in law it cannot. (1 *Dessaus*, 309.) Other Courts have held with ours that fraud must be clearly and distinctly made out, and cannot be inferred from circumstances of an equivocal tendency. (23 *Maine Rep.*, 46; 2 *H. & J.*, 414.) It is not to be lighly presumed after a denial in the

answer. (4 *Dessaus*, 473.) Nor is it to be imputed upon slight evidence. (3 *Dessaus*, 12.) It is not to be considered as a single fact, but a conclusion to be drawn from the circumstances. (2 *H. & J.*, 292, *Broyden* vs. *Walker.*) If we apply these principles to this case we shall find that the assignees fully deny every fact outside of the deed which can affect them with a knowledge of an intention on the part of the assignors to hinder, delay, &c., within the meaning of the statute.

We cannot see anything in these facts which distinguishes them from those stated in a large proportion of the cases we have cited. The complainant was about to sue out a writ of attachment by which he would seize upon sufficient property to pay his debt; no one could (as under former statutes) participate with him in the benefits to result from such a proceeding. He would have acquired the same preference over other creditors, as if he had levied an execution upon the debtor's property. This proceeding would have resulted in applying a large portion of the assignors' property to the payment of a single debt, and would have defeated all just preferences, which the law seems to treat as just.

Mr. Tracy in the case which we have cited from 11 Wendell, says: "Either principle, that of assignment or that of preference, standing by itself, might very well be questioned; but brought together they form an unnatural coalition, from which little that is salutary or honest can be anticipated." Granting that there are great objections to preferences, and that this power is very liable to be abused, and prostituted to dishonest purposes, still it is engrafted into our law, and the power so far as we know has been as fairly exercised in this case, as in any of the cases we have cited. There does seem to be something a little repugnant to our sense of right and fairness in the fact that the man whose legal diligence was thwarted, should be placed in the third class of creditors, and may possibly never receive any dividends, but we have no proof as to the merits of his claim, which should lead us to infer that a fraud must have been intended, and this Court sitting as a Court of Chancery, are not to assume that because the complainant was the most diligent, he was therefore the most meritorious, or that he had any superior equity over any of the other creditors.

Some of the States have passed laws prohibiting preferences; until this shall be done in this State, the power to make them, will exist as a legal right. We can see nothing in the preferences in this case which is inconsistent with that measure of discretion, which the law allowed to the debtor. These creditors for whom provision was made, for aught we know or that has been intimated by counsel, were a meritorious class of creditors, and most likely the most ignorant and unsuspicious— some of them were mechanics and laborers, who confided in the integrity of the grantors.

In the general aspect of the case, it will be noticed that the assignors did not part with all their property; that they reserved what was by law exempt from levy and sale on execution. The equitable rule of which we have spoken, appears not to be satisfied with a surrender of a part of a debtors goods; it seems to exact the whole. The fact that the debtors in this case have, to the extent of the exemption, made their own terms and sought the protection of the law, and thus departed from that generous and honorable standard which the equitable rule commends, would appear when it is first presented to the mind to detract from the supposed fairness of the assignment. But we have seen that when properly and fully considered it will not appear to be objectionable. The debtors have saved nothing which the creditors, under the most rigorous enforcement of the law could have obtained or claimed; and shall we say that because they have reserved to themselves what the law could not have exacted or taken from them, that therefore they shall not have what the law would have allowed to them?

This assignment has been attacked at so many points, unless we bear in mind that so far as relates to the provisions in the deed, none of them are vulnerable, we may be impressed with the idea that the attack has been in some way or another successful, without being able to point out a single breach. Certain it is, no impression has been made upon any of the clauses of the deed. As to the rest of the case it will be found that the charges of fraud so often repeated, have not been supported by the proof, which has failed to afford any definite, or at least conclusive indications of fraud.

Taking a general view of the facts exhibited in the record, and looking at them as a whole, we are constrained to remark that we can per-

ceive nothing in them that will lead the mind to a rational conclusion that the assignment was made or contrived in malice, fraud, covin, or guile, with the intent or purpose of hindering, delaying, or defrauding creditors—nothing that is not reconcileable with the undoubted right of providing for and securing a favored class of creditors.

The judgment of this Court is, that the decree of the Circuit Court be reversed, with costs to the defendants of this Court and of the Circuit Court, and it is ordered that this case be remitted to the Circuit Court for the county of Jackson.

Johnson, J., being a party, did not participate in the decision of this cause.

Green and Copeland, Judges, did not concur.