## TERRITORY OF WYOMING *v.* NELSON.

PROSECUTING ATTORNEY : EXCEPTIONS.—Under the laws of this Territory, the prosecuting attorney may take exceptions to any opinion or decision of the court, during the prosecution of the cause, which he may think erroneous.

STATUTES: CONSTRUCTION.—Where a statute directs the doing of a thing for the sake of justice or the public good, the word "may" will be construed to mean "shall."

IDEM.—Section 1895 of the Revised Statutes of the United States provides : "Any person convicted by a court of competent jurisdiction in a territory, for the violation of the laws thereof, and sentenced to imprisonment, may at the cost of such territory, on such terms and conditions as may be prescribed by such rules and regulations, be received, subsisted and employed in such penitentiary during the term of his imprisonment, in the same manner as if he had been convicted of an offense against the laws of the United States." *Held*, that the word "may" used in the statute means "shall," and that the penitentiary at or near Laramie City, erected by authority of the laws of congress, is the only penitentiary for the confinement of persons convicted in the several district courts of this Territory, for offenses against the laws of the Territory, and the punishment for which is by territorial statutes, prescribed to be confinement in the penitentiary, unless congress shall otherwise legislate.

ERROR to the District Court of Albany County.

This case comes from the district court of Albany county; the case was tried at the February, 1880 term, at Laramie City, in said county.

Andrew Nelson, the defendant in error, was regularly indicted by the grand jury of said county, for the crime of "knowingly killing neat cattle not his own," was regularly tried on said indictment, found guilty by the jury and his term of imprisonment in the penitentiary at six months.

Whereupon the prosecuting attorney of Albany county moved the court for sentence of said Andrew Nelson to the penitentiary near Laramie City, that being the only penitentiary known and established by the laws of Wyoming within the said Territory.

The court overruled this motion; and over the objection of the said prosecuting attorney and on its own motion pro-

ceeded to sentence the said defendant Andrew Nelson to the state penitentiary in Lincoln, in the state of Nebraska. Which said sentence the prosecuting attorney of Albany county deeming to be unlawful, erroneous and absolutely void, presenting his bill of exceptions, setting forth in substance the above facts, which was signed by the court below and permitted to be filed in this court, under secs. 146–149 of the Criminal Code.

*M. C. Brown*, for plaintiff in error.

That the legislature can only enact laws having force and validity within certain territorial limits. See secs. 1 and 4, Organic Act. See also, Cooley's Const. Lim., p. 128; Bishop's Crim. Law, vol. 1, p. 120 and 122.

That the judicial authority is no broader than legislative. See Organic Act, sec. 9; Cooley's Lim., page   ; *Ableman* v. *Booth*, 3 Miller U. S., 145; Bishop Crim. Law, 120; also 79–81, and 84. The mittimus is void on its face because it directs the officer in charge of the defendant to convey the said Andrew Nelson to the state penitentiary at Lincoln, in the state of Nebraska, a place beyond the limits of Wyoming, and a penitentiary over which the courts of Wyoming have no control. Laws cannot have extra territorial force. See Cooley's Con. Lim., 128, and other authorities there cited. That a law attempting to authorize transportation for crime is subject to constitutional objection. See sec. 16, Organic Act; Article 8, Constitutional Amendments, U. S.; Cooley on Con. Limitations, page 329, and authorities there cited; Bishop Crim. Law, secs. 718, 711, *et seq.* No authorities are necessary to show that a sentence of transportation, when not included in the penalty for the violation of a particular statute, is absolutely void.

*W. W. Corlett*, for defendant in error.

The legislation of the territory in respect to the confine-

ment of persons convicted of felony, does not authorize any court to sentence such persons to the penitentiary at Laramie City. Hence the motion of the prosecuting attorney was properly overruled, and his exception was not well taken. Comp. Laws of Wyo., 496, 568, 569. Sess. Laws 1877, p. 87; Sess. Laws, 1879, p. 142.

The exception having been taken to the action of the court upon two propositions, and being right as to one of them, is not well taken.

The law of the Territory as it now stands, provides that a person convicted of crime shall be transported out of the Territory for imprisonment. This is an inherent right in government, unless it has divested itself of the right. 1 Archbold, C. P. & P., p. 687. And so perfect is this right that express constitutional inhibition is necessary to take it away. See charters and constitutions of the various states of the union, pp. 78, 156, 631, 1215, 1295, 1420, 1466, 1647, 1695, 1825, 1877, 1995.

The doctrine that a statute has no extra territorial force or operation is restricted by the qualification that it may and frequently does have effect in a foreign jurisdiction— not *propria vigore*, but by comity. See Rev. Stat. U. S., secs. 4079–4098.

A corporation created by one state, and thus dependent for its very existence upon the law of the place where created, may act and do business in another state, unless prohibited by such other state from doing so, and may even acquire constitutional rights in the latter state. This could not be the case except by a recognition of the law creating the corporation, and by giving it force and effect beyond the limits of the state enacting the law. *Ins. Co.* v. *Morse*, 20 Wal., 445; *State* v. *Doyle*, 40 Wis., 184; *Doyle* v. *Ins. Co.*, 4 Otto, 537; *Brown* v. *People*, 75 N. Y., 437.

Again, the state governments have no jurisdiction over places ceded to the United States, and yet it has always been conceded that the state ceding such places might serve its civil and criminal processes within such places, with the

consent of the Federal government. 1 Kent's Com., p. 429, *et seq.* The place of execution of a sentence in a criminal case was not, at common law, a necessary part of the sentence, and as we have seen, the statutes of England providing for transportation beyond the seas, did not name the place of imprisonment. 4 Blackstone's Com., p. 404. No express decision on the precise point in this case has been found, but as it has long been the practice for the states and territories to send prisoners to another jurisdiction for safe keeping, the absence of any decision holding such a practice to be unlawful, affords a strong reason for believing such legislation to be valid. It is the constant practice to send insane persons from one jurisdiction to another for safe keeping in an asylum. If that may be done as to a person who is merely unfortunate, surely the same thing may be done as to a criminal. See Com. Laws of Wyo., p. 280. If a court order a prisoner to be imprisoned in a particular place, the confining the prisoner in any other place would be false imprisonment. 1 Bis. on Crim. Pro., sec. 888. An error in the sentence of a criminal court as to the place of imprisonment cannot be reviewed on *habeas corpus*, the criminal court having jurisdiction to determine the question before it. *People* v. *Keeper of Penitentiary*, 37 How. Pr., 494, S. C.; 1 Brightly's Digest, p. 1922. Although no precedents have been found which are directly in point upon this case, yet the supreme court of the United States in the case of *ex parte Kaistendick* have recognized and enforced a principle which completely and fully sanctions the legislation now questioned, and sustains the judgment of the court below in this case. *Ex parte Karstendick*, 3 Otto, 396.

SENER, C. J. This case has been docketed for hearing here by leave of the court, under and by virtue of secs. 146, 147, 148, 149, of the Criminal Code of Wyoming, as found on pages 157 and 158 of the edition of 1876. These sections thus referred to are as follows :

Section 146. The prosecuting attorney may take excep-

tions to any opinion or decision of the court during the prosecution of the cause: and the bill containing the exceptions, upon being presented, shall, if it be conformable to the truth, be signed and sealed by the court, which shall be made (be) a part of the record, and be in all respects governed by the rules established as to bills of exceptions in civil cases, except as herein provided.

Section 147. The prosecuting attorney may present such bill of exceptions to the supreme court, and apply for permission to file it with the clerk thereof, for the decision of such court upon the points presented therein; but prior thereto, he shall give reasonable notice to the judge who presided at the trial in which the bill was taken, of his purpose to make such application, and if the supreme court shall allow such bill to be filed, such judge shall appoint some competent attorney to argue the case against the prosecuting attorney, which attorney shall receive for his services a fee not exceeding one hundred dollars, to be fixed by such court, and to be paid out of the treasury of the county in which the bill was taken.

Section 148. If the supreme court shall be of the opinion that the questions presented shall be decided upon, they shall allow the bill of exceptions to be filed and render a decision thereon.

Section 149. The judgment of the court in the case in which the bill was taken shall not be reversed, nor in any manner affected; but the decision of the supreme court shall determine the law to govern in any similar case which may be pending at the time the decision is rendered, or which may afterward arise in the territory.

The court has listened with great pleasure to able and learned arguments on many points growing out of the treatment of the case at bar. To our view, however, there is but one practical question presented for decision, and that necessarily embraces all others. That question narrows to this: What is the penitentiary for the confinement of all persons convicted of any offense against territorial laws,

the punishment of which is confinement in the penitentiary
of the territory? Or, as the prosecuting attorney for
Albany county puts it, in the motion for the sentence of
Andrew Nelson—which having been overruled, brings this
question into this court for decision,—Is the penitentiary
at, or near, Laramie City, in Albany county of this Terri-
tory, the only penitentiary to which persons convicted in
Wyoming of felonies under territorial laws, can be sentenced
lawfully, for the terms fixed by the courts and according to
law? The motion does not of itself clearly show, but the
full record, as well as the official position of the prosecu-
ting attorney for Albany county does show that Andrew
Nelson was convicted of an offense made a felony by terri-
torial law, and therefore the scope and purpose of the prose-
cuting attorney's motion was to ascertain the proper peni-
tentiary of the Territory, and have Andrew Nelson sen-
tenced thereto.

The district court of Albany county disregarded and
overruled the motion of the prosecuting attorney for Albany
county, and of its own motion sentenced the said Andrew
Nelson to the Nebraska penitentiary, at Lincoln, Nebraska,
doubtless under direction of chapters 80 and 81, of the
laws of the sixth legislative assembly of Wyoming, ap-
proved December 13, 1879, pages 142 to 146 inclusive.

The act which undertakes to fix and locate "a" peniten-
tiary of this Territory at Lincoln, Nebraska, is as follows:
page 142, session laws 1879; section 1. "That the state
penitentiary of the state of Nebraska, located at Lincoln, in
the state of Nebraska, is hereby declared to be a territorial
penitentiary of the Territory of Wyoming, for the confine-
ment of all convicts of said Territory of Wyoming, who
have heretofore been sentenced, or may hereafter be sen-
tenced, by any of the courts of said Territory of Wyoming
to confinement therein."

Before proceeding to consider the question, or questions,
raised in the record, it is proper to notice the point made in
the argument by the counsel representing the court below,

or the judge thereof, that the record or transcript as brought here presents no "opinion or decision" for consideration and determination by this court, as contemplated by the statutes hereinbefore quoted. There certainly was a "decision" by the court below when it rendered judgment against Andrew Nelson who was duly indicted, tried, and by a jury found guilty of a felony under the laws of the Territory (which by the territorial law, is required to be punished by confinement in "the" penitentiary), and sentenced him to confinement in the penitentiary at Lincoln, Nebraska. The only question, was it "during" the prosecution of the said Andrew Nelson? If we can determine the meaning of the word prosecution, as used in the statute, we shall have settled this point without more trouble. Referring to Webster's unabridged dictionary, we find this definition of the word "prosecution," under subdivision of definition: "The institution or commencement of a criminal suit; the process of exhibiting formal charges against an offender before a legal tribunal and pursuing them to final judgment, on behalf of the state or government, or by indictment or information." And judgment is by the same author defined to be: "The sentence of the law pronounced by the court, or the judge thereof, upon a matter in issue before it." Surely then the judgment rendered in this case was the sentence, and the judgment, being defined to be a part of the prosecution, it was during the prosecution, for during really means "as long as the existence of."

The prosecution certainly existed until it terminated in the final judgment of the court, to-wit: the sentence. This being ascertained, it will follow necessarily that it is not only the right but the duty of this court to pass upon and decide the questions raised by the prosecuting attorney of Albany county, in the court below, and brought here properly for our consideration and determination. It was insisted, however, in argument, that the territorial attorney ought not to be heard here, when denying the validity of a law of the legislature. The answer to this is, that by the

law of this Territory the prosecuting attorney may take exceptions to any opinion or decision of the court during the prosecution of the cause, which he may think to be erroneous, though these words are not in the statute. Then he is to apply for permission to file these exceptions in this court, and if this court is of the opinion, upon the record as presented, that the question shall be decided, they shall allow the case to be docketed, and shall render a decision thereon. Surely no more important questions were ever presented to this appellate court. The questions growing out of the proper penitentiary of this Territory or whether there is one or more than one, is covered and embraced in at least six acts of congress, and as many territorial enactments. The doubts and differences on the subject have led to conflicting rulings and decisions of inferior courts and the judges of this Territory; and it is the duty of this court here and now to settle the questions thus presented as to the penitentiary for the confinement of persons convicted of crime in this territory against its laws, the punishment for which, by these laws, is provided for in the penitentiary. They affirmed this to be their duty when they allowed the bill of exceptions to be filed and the case docketed in this court, which was done after consideration, and they proceed now to discharge that duty by rendering a decision thereon as by law they are required to do. The Territory of Wyoming and all the territories that have been, are now or may be hereafter created by congress, are the creatures of congressional legislation. By it they all " live, move and have their beings," until of proper growth and development, they become states. Then the territorial existence ceases; they become states, and congress has such power of legislation over them and within their territorial limits as is conferred by the constitution over states. During their territorial life they exist and continue usually by organic acts, which it is in the power of congress to alter, modify or change as to it shall seem fit from time to time. Congress, in its dealing with the territory, could of course legis-

late for them directly in all cases if it aw fit so to do, and in some respects, and at some periods, it does this directly, as, notably, in the case of Utah and the District of Columbia. When so legislating, as primarily in organic acts, it provides for them certain officers, defines their duties, in whole or in part, and gives them certain appurtenant machinery of government, and when others are needed, congress provides the several territories with legislatures, and these are clothed with authority to supply all deficient needs; they are authorized to pass laws for the government of the territories, and their only restriction is to be found in section 1850 of the revised statutes, which clothes the several legislatures of the respective territories with power to pass all laws over rightful subjects of legislation, provided they are not inconsistent with the constitution and laws of the United States.

In July, 1868, the Territory of Wyoming was created, and in May, 1869, the territory was formally organized. The first legislature adjourned in December, 1869. Now, in so far as the organic act of the Territory speaks, it is, if consistent with the Constitution of the United States, our supreme law, and, obviously, the territorial legislature can pass no law inconsistent therewith. Is it not in the very line of this thought to hold that whenever congress legislates over any subject touching territorial affairs, the legislation of congress becomes to that extent the only legislation that can be maintained by the courts for the orderly government of its people? If so, and we think so, we have only to apply this principle and we shall find what congress has spoken touching a territorial penitentiary for the Territory of Wyoming.

By an act of congress, approved July 15, 1870, found on page 314 of the Statutes at Large, in the appropriation bill of that year, under the miscellaneous heading, it was enacted as follows: "For the erection of penitentiary buildings in the Territory of Wyoming, forty thousand dollars, or so much thereof as may be necessary," which

sum, or so much thereof as may be necessary, was to be expended under the direction of the secretary of the interior. Under and in virtue of this act, the penitentiary at Laramie was built and set apart for prison purposes.

Then followed the act of congress, approved January 10, 1871, in relation to certain territorial penitentiaries which have been, or may hereafter be erected by the United States in any organized territory, and places them under the care and control of the marshal of the terrritory or district in which such penitentiaries may be situated. This act, as incorporated in the Revised Statutes, changes *the* to *any* penitentiary, and *any* organized territory to *an* organized territory.

Section two, of the act of January 10, 1871, need not be quoted here; it is the same as section 1894 of the Revised Statutes, and has no bearing on this question just here. Section 1895 of the Revised Statutes has, however, an important bearing on this subject. It is the third section of the act of January 10, 1871, and is here quoted in full. It provides as follows: "Any person convicted by a court of competent jurisdiction in a territory for a violation of the laws thereof, and sentenced to imprisonment, may, at the cost of such territory, on such terms and conditions as may be prescribed by such rules and regulations, be received, subsisted and employed in such penitentiary during the term of his imprisonment, in the same manner as if he had been convicted of an offense against the laws of the United States." For a proper understanding of this matter, and for the reasons that are hereinafter more particularly referred to, we will here cite sections 1892 to 1894 of the Revised Statutes, inclusive, entire, as they appear published in said Revised Statutes, in addition to section 1895, already stated in full:

Section 1892. Any penitentiary which has been, or may hereafter be erected by the United States in an organized territory, shall, when the same is ready for the reception of convicts, be placed under the care and control of the

marshal of the United States for the territory or district in which such penitentiary is situated; except as otherwise provided in the case of the penitentiaries in Montana, Idaho, Wyoming and Colorado.

Section 1893. The attorney-general of the United States shall prescribe all needful rules and regulations for the government of such penitentiary, and the marshal having charge thereof shall cause them to be duly and faithfully executed and obeyed, and the reasonable compensation of the marshal and of his deputies for their service under such regulations shall be fixed by the attorney-general.

Section 1894. The compensation, as well as the expense incident to the subsistence and employment of offenders against the laws of the United States, who have been, or may hereafter be, sentenced to imprisonment in such penitentiary, shall be chargeable on, and payable out of, the fund for defraying the expenses of suits in which the United States are concerned, and of prosecutions for offenses committed against the United States; but nothing herein shall be construed to increase the maximum compensation now allowed by law to these officers.

From what has so far appeared, we find a penitentiary built within the territorial limits of Wyoming by the United States, with United States funds. Now, for what purpose was it erected? For the imprisonment of offenders against Federal laws, who have been convicted?

Section 1892 does not make this distinction, but declares that it shall be placed under the care of the United States marshal, when the same is ready for the reception of *convicts*, not restricting its use or occupancy to this class of convicts. And sections 1894 and 1895 of the Revised Statutes point out how the cost of maintenance shall be borne, and how the penitentiary may be used. The one provides for charging the United States with the cost of maintaining the Federal convicts, or those convicted of offenses against the national authority within the territory; the other points out how the cost of maintaining those who

commit offenses against territorial laws shall be paid.   That
section 1894, which provides for the use of the penitentiary
for offenders against the laws of the United States, speaks
of those who have been, or *may hereafter* be sentenced to
imprisonment in such penitentiary.   Now, has it ever been
maintained, or can it be, that without a law of congress so
directing, the United States, through its attorney-gen-
eral, could, so long as this penitentiary is kept up, order the
imprisonment of offenders (those charged with, or those
convicted of United States offenses in this Territory), else-
where than in this penitentiary ?

   But it is seriously claimed, notwithstanding this legisla-
tion pointing affirmatively to the use of this penitentiary
for convicts against territorial laws, (legislation as binding
as the organic act, in our opinion), that it is competent in
the legislature not only itself to erect or locate another
penitentiary, but it is seriously claimed that this can be
done for the Territory, not by its legislature but by a third
body, erected for that purpose by the legislature, and that
in pursuance of such a power and policy it can be erected
in Maine, Florida, Alaska or Nebraska, as this commission
shall determine.   To justify legislation looking to this end,
there is running through it all a leaning to economy, which
is highly commendable, if from an economic standpoint, so
far as the Territory is concerned, the matter was alone to
be decided.   But if this view were to enter into considera-
tion, with what justice ought the Territory to ask or expect
the Federal government to erect buildings for penitentiary
purposes in her limits for the punishment of its offenders,
and to expect it to provision it and man it, and yet not help
to use it?   Can any one rationally conclude that the gov-
ernment of the United States, through congress, had any
other purpose in building a penitentiary out here in
Wyoming, than that it should be used for both United
States and territorial convicts?   Can it be supposed that in
a territory, then numbering less than 10,000 people, the
government would have erected a building of sufficient

accommodation for both classes of convicts, (for this was not denied in argument, and all the territorial legislation affirmatively shows it), when its use would be restricted to one class of convicts? Are not sections 1892 to 1895, inclusive, to be read together? Are not the needful rules and regulations which, by section 1893, the attorney-general is required to prescribe, to be held to embrace the rules and regulations that are to contain the terms and conditions on which the territorial convicts are to be received, subsisted and employed? Clearly we think so. The whole question outside of such palpably common sense arguments as these, must depend upon the sense in which the word "may" is used in section (R. S.) 1895. If it is used in a permissive sense, what then? We take it that this will logically and inevitably follow, that if it is to be treated permissively as allowing the Territory to use the penitentiary for territorial prisoners, it was not to be understood as allowing the Territory to use it so long as said Territory should see fit to do so. But if permissive, it was a privilege that once availed of, could not be recalled, save by the permission of congress. If it was permitted to use, surely there is no permission in the statute, or subsequently, to cease the use, or to abandon the use of the penitentiary. That the Territory accepted the penitentiary for its prisoners, is shown by the act of the territorial legislature, approved December 13th, 1873. That act recited the fact that there were several prisoners then at the Laramie penitentiary, and that legislature acknowledged not only its moral and legal obligation to keep them there, but inferentially to send others there *until that penitentiary was closed up or abandoned by the authorities of the United States.* That act, it seems to us, binds the Territory, if the word "may" is to be treated as permissive, beyond recall, save by the consent of congress, to use the penitentiary at Laramie so long as there is prison room there for territorial convicts, and for these reasons:

I. That act speaks of the penitentiary at Laramie as *the*

penitentiary of the Territory, clearly for offenders against territorial laws. The legislature had no authority to declare it a penitentiary for any other purpose.

II. The legislature declared that there were convicts there. If there, they must have been there by enactment of the legislature, or this act must be construed as ratifying their being there, or that no act of the territorial legislature was therefore deemed necessary on the part of the courts in sending them there, the acts of congress being theretofore doubtless deemed by the courts sufficient authority for that purpose. The word "may," however, has in statutes a separate meaning. Let us see what it is. Bouvier's Law Dictionary, 2d vol., under heading "may," says:

"Whenever the statute directs the doing of a thing for the sake of justice or the public good, the word 'may' is the same as 'shall.' It cites a statute of one of the Henrys, where the sheriff, it is said, 'may' take bail; and again the words 'shall' and 'may' in general act of the legislature, are to be construed as imperative. The interpretation of the word 'may' in statutes, and the criterion of its meaning, passed under the eye of the supreme court of the United States in *Mann* v. *Pearson*, 22d Howard. Here the court quotes approvingly, *Rex & Regina* v. *Barlow*, 2d Sacket's, 609, which says: Where the statute *directs the doing of a thing for the sake of justice or the public good* the word 'may' is the same as the word 'shall.'" The court goes on to cite other cases, and says: "Without going more into details these cases fully sustain the doctrine that what a public corporation or officer is empowered to do for others, and it is beneficial for them to have done, the law holds he ought to do. The law is conferred for their benefit, not his; and the intent of the legislature, which is the text in the case, seems under such circumstances, 'to impose a positive and absolute duty.'"

Tried by the two leading decisions can there be any doubt of the proper meaning of the word "may" in sect. 1895 of the Revised Statutes? Surely the use of the peni-

tentiary by the Territory for the imprisonment of offenders against its laws was to be for the public good, for the suppression of crime and the correction of the offender. It was for the sake of justice that it was to be so used. If we try it by the principle of the last decision, certainly the territory—the corporation, so to speak, erected by congress—the government of Wyoming was empowered to use this penitentiary for others, *i. e.*, the whole people of the Territory, in the interest of good government, and surely it was beneficial " then " to the people to be allowed its use for the imprisonment of convicts against territorial laws. As we have shown before, the legislature so thought and acted and used this penitentiary because it was beneficial for them to do so.

Suppose, applying another test, the warden of the penitentiary had refused the use of the penitentiary for territorial prisoners: can it be doubted that by proper process under this law the Territory could have exacted the use of the penitentiary for offenders against territorial laws? We think so. If, then, the Territory has a right to its use at any time, and can enforce that right to the extent of its accommodation for its own prisoners, has the United States no right to compel the Territory to use said penitentiary so long as there is room there, unless congress shall otherwise legislate?

It seems hardly necessary to pursue this discussion further, yet we will quote two more decisions of the supreme court of the United States determining the meaning of the word " may." They are *City of Galena* v. *Amy*, 5th of Wallace. There the court held an act of the legislature as imperative which said that the city council *may*, *if it believe the public good and the best interests of the city require it*, levy a tax, &c.

The court cited approvingly the *Supervisors* v. *United States*, 4th Wallace, 435. There the supervisors were authorized, *if deemed advisable*, to levy a tax, &c.

The court said that permissive long usage will be

regarded as peremptory where the public interests or individual rights require it. The legislature, in accepting the use of the penitentiary for its convicts, certainly is authority. And can we suppose that they then acted otherwise on the question of the public interests than for the public interests in sanctioning the use of the penitentiary? Again, have citizens who have once committed offense and to be punished therefor, and by the theory of humane laws to be made fit for renewal of their citizenship, no right to consideration as to the place of their incarceration during the penitentiary period? Men and women who commit crime are sent to prisons for fixed terms with the view of making them better, and with the hope that they may again be fit for investiture with citizenship—that they may be again incorporated into the community, not that they may be exiled therefrom and become outcasts. Their *civiliter mortuus* condition is generally only for the period of their punishment. These, it seems to us, are proper views in the light of public interests, leaving out of view the public interests of the overshadowing United States government that built this prison home for us, and have a right to look to the territorial government to assist in its keeping and maintenance, from every consideration of fairness and justice. Their public interests, as well as the other mentioned, are certainly to be consulted and considered in determining the meaning of the word "may" in sec. 1895, of the Revised Statutes. And if so, can we doubt its imperative meaning? Nor do we believe that we do any violence in saying that this law is, or do we believe that congress did wrong in making it. Concede, from an economic standpoint, that it may apparently cost less to keep the prisoners outside the Territory than inside, if such an argument could weigh with us, (which cannot be), is it not of some consideration that in keeping them at home that much money is kept within the Territory, and to that extent helps build it up, and if any part of the Territory be helped, will not in time and in turn the whole be helped?

And so far from imposing a burden or doing an injury to the tax payers of the Territory, is not this mandatory law as to the use of the penitentiary really to their general and public interest? Can this really be doubted when fairly and dispassionately considered? The court further proceeds to say in the last cited case as to the *permissive* word "may" that it shall be treated and read as "shall" when power is placed with a depositary to meet the demands of right and to prevent a failure of justice. It is given as a remedy to those entitled to invoke the aid, and who would be otherwise remediless. The congress, in establishing this penitentiary evidently did so because at that time there was none for the imprisonment of convicts, and they used the word "may," so far as the Territory was concerned, as "shall," because it was then the duty of the Territory to invoke this aid they extended for the confinement of the convicts in a penitentiary, and by the then condition of affairs the Territory would have been remediless so far as having a penitentiary in its own limit went, if it had been that from the use of the Laramie penitentiary.

Once accepting its use and using it the Territory exhausted even the permissive force of the word "may," and until congress shall otherwise direct the word "may," must even if originally permissive, which we do not hold, be treated now as imperative and mandatory in this section of the Revised Statutes, to wit: Section 1895.

The tendency of legislatures in making statutes and courts, in construing them to give to the word "may" the force of "shall" or "must," comes to us not only with the sanction of English common law and chancery interpretation, and sustained by the highest tribunal of our own land in the interpretation of Federal and territorial enactments, but the courts of the several states of the Union also have inclined that way most strongly, as will be seen by reference to the cases cited in Abbott's Law Dictionary, under the heading "*May*." There, some thirty decisions from at least twelve states, construe "may" as used *imperatively* and

*mandatory*, while only some five or six are being obviously treated as permissive.   Thus we find ourselves, as we think, sustained by principle, reason and authority in giving to the word "may," in section 1895 of the Revised Statutes, an imperative sense and meaning, and so treating it there for all the purposes of this discussion as having the force of "shall" or "must."   It may perhaps be proper to go a step further to answer the point made by counsel in the argument, that the state of Nebraska has authorized the use of the penitentiary at Lincoln, Nebraska, for our territorial convicts.   It will be a sufficient answer to this to say that the United States in congress assembled has so far not authorized any such use, which to our minds must be a condition precedent to such use by this Territory of such prison house.   To the suggestion contained in the citation of Kaistendick, case 3d of Otto, 396, that being a case where the district court in the state of Louisiana sent a prisoner, Kaistendick, to the Moundsville penitentiary in West Virginia, selected as such by the attorney-general by virtue of an act of congress,—it will be sufficient to say that the penitentiary was in the jurisdiction of congress, being within the Union.   If it be maintained further as it was at bar that the legislation of the territories is the legislation of congress for the territories, we answer yes, such legislation when acting and operating within the limits of the Territory is supreme, when not inconsistent with the laws of Congress or the Constitution of the United States.

We have heretofore maintained that every attempt to erect another penitentiary within this territory so long as the penitentiary at Laramie has sufficient accommodations for the "reception, subsistence and employment of the convicts for offenses against territorial laws," is inconsistent with section 1895 of the revised statutes and so void and of no effect.   Hence it follows that each and every act of legislation on the part of the Territory of Wyoming for this purpose, must fail and fall when considered in connection with section 1895 of the Revised Statutes, as interpreted by

this opinion and the decision that will follow in conformity therewith.

Nor can we see any hardship in this matter, as possibly may be felt if the legislation of the recent session of the assembly of this territory is the reflection of the sentiment of its people ; for congress in 1873, by an act to be found in section 1936 of the revised statutes provided that " the care and custody of the penitentiaries in this Territory (among others) and the personal property thereunto belonging, and the use and occupation thereof be transferred to the Territory, until otherwise ordered by the attorney-general, but the legal title to such penitentiary and the property, shall continue to be in the United States, and by section 1937 the congress makes it mandatory to keep all persons convicted in the Territory of violations of the laws of the United States, and sentenced to imprisonment therefor, as well as all persons held to answer for alleged violations of the laws of the United States in such territories, and fixes the rate of keeping at one dollar per day. The act of December 13, 1873, of the legislature of Wyoming, before referred to in this opinion, recited this act and declared that no provision had ever been made by territorial law for assuming such custody and control, and none ever has been passed for assuming it. This act of the territorial legislature expressly conferred authority on a board of penitentiary commissioners to accept and take control of the Laramie penitentiary, *provided* the congress of the United States shall hereafter transfer the same to the Territory of Wyoming.

By transfer, meaning doubtless, if the United States should vest the title of the property in the Territory instead of its custody and control. On the 8th of December, 1869, the territorial penitentiary was, by a law that day approved, located at Laramie, and the rest of that act provided for building and keeping it as such, but that whole act seems constructed upon the idea that the government of the United States would furnish the money and build it and vest the title in the Territory of Wyoming, and the act

of 1877 seems to run in the same direction.   That idea and
the economy which the legislature seems to have been con
sulting or attempting to consult, apparently underlie all the
controversy as to the penitentiary of the Territory for terri-
torial prisoners.   Of course we have nothing to do with the
motives of the legislature, but as no motives of this kind, or
any other, can cause us to negative and set aside a law of
congress in favor of a territorial enactment.   If they are
reconcilable and consistent we can uphold both.   If one be
inconsistent with the other, the law of congress must pre-
vail.   Our duty is to declare the law.   It was the duty
of congress primarily (which it has done) to make the law.
In making it congress has erected, out of the government
funds, in the Territory, one penitentiary, and has said prac-
tically:   "There is the penitentiary for your Territory!
the title is in the United States!   You must imprison your
territorial felons there!   The general government will keep
that penitentiary under its control and custody and your
convicts will be kept there by our officials at your cost, or
you may assume the custody and control of the penitenti-
ary and we will then keep the prisoners convicted of, as
well as those charged with offenses against our laws at rates
fixed by congress!"   The Territory for some years past not
in the line of earlier legislation in the other direction, has
by its legislation practically said that it will do neither.
This court not making but only saying what the law of
congress is, declares that as the legislation now stands the
Territory of Wyoming must do one or the other, and there-
fore that it must keep all persons convicted of felonies,
made such by territorial laws, in the penitentiary at Laramie
city, until congress shall otherwise legislate, and so long as
there is prison room there for such convicts.   Our conclus-
ion whilst setting aside all the territorial legislation that
seeks to create any other prison house as the penitentiary
of the Territory save that at Laramie city, yet preserves the
distinction between felonies and misdemeanors as defined
in the first section of the act offered December 5th, 1873,

General Laws of Wyoming, 1876, and so essential to the administration of justice.

Any other conclusion would nullify a law of congress, blend penitentiaries and jails in confusion, in direct conflict with the act of December 5th, just referred to, cast upon sheriffs duties never contemplated by fair intendment of proper and consistent territorial laws, make penitentiaries of jails without the consent of the respective counties that built them by taxation and possibly to their detriment in so doing, and enlarge in our opinion without authority of law and without necessity, the scope of territorial legislation so as to give it extra-territorial force.  It only remains for the court to render its judgment upon the bill of exceptions presented in this case comformably to sec. 149 of the Laws of Wyoming, p. 158 (hereinbefore cited) of the Compiled Laws of Wyoming, which judgment that statute expressly declares shall not reverse the judgment and sentence in the case of Andrew Nelson, or in any manner affect it, but the judgment now about to be rendered shall be the decision of· the supreme court of this Territory which shall govern in any similar case which may be pending at the time this decision is rendered, or which may hereafter arise in the Territory. Wherefore it is considered by the court, and so to be entered of record as our decision, that the penitentiary at or near Laramie city, erected by authority of a law of congress of the United States, is the only penitentiary for the confinement of persons convicted in the several district courts of this Territory for offenses against the laws of the Territory, and punishment for which is, by territorial statute, prescribed to be confinement in the penitentiary unless congress shall otherwise legislate, and so long as there is in such penitentiary prison room for said convicts.

PECK,  J., delivered the following concurring opinion.

The prosecuting attorney for Albany county has under sections 146, 147 and 148 of the Criminal Code—Compiled Laws, 157 and 158,—filed here a transcript from the second

judicial district court for that county in this case, which includes a duly allowed bill of exceptions. Sections 148 and 149 provide that we shall render a decision upon the question so presented; and that our decision shall not affect the judgment that has been rendered below, but shall determine the law for like cases pending at the time of or arising after our decision. Leaving the judgment to stand, we determine principles for future guidance. I speak of a duly allowed bill of exceptions. Coupling sec. 146 with secs. 502 and 303 of the Civil Code, p. 71, I am not clear that the present are not record exceptions under 303; and therefore not appropriate to or presentable by a bill; consequently, that secs. 146, 147 and 148, confer upon us jurisdiction to review them. The subject was not mooted at the bar—should be discussed, —and I concluded for the purposes of this case to treat them as jurisdictionally before us. It would be the duty of this court upon an ordinary appeal to exhaust the exceptions in all the aspects which are requisite to their determination; and *a fortiori* upon an appeal, which is intended to obtain an exposition of all the law that is necessarily involved in the exceptions, our analogies should be exhaustive, except as to subjects which it may be proper to leave for future consideration. At the February term for 1880, the defendant was duly convicted of felony in that court, sitting in that county; the prosecutor moved for sentence to the Federal penitentiary which is located there. The motion was denied, and an exception taken: the court then sentenced Nelson to the Nebraska state penitentiary, which is located at Lincoln, Nebraska, for the term of six months; and to that judgment the prosecutor excepted.

These are the only exceptions that are presented for our consideration. The case has been ably and instructively argued on both sides; and we have endeavored to treat it with the care that is due to its unusual importance.

Nelson objects that the Territory cannot be heard upon the exceptions, because under those sections we can entertain only such exceptions as the prosecuting attorney shall take

during the prosecution of the case, as provided in section 146; and the present exceptions were taken after the prosecution. Whatever can be entertained here upon this proceeding, must be taken under that section. It provides that he may except to any opinion or " decision of the court during the prosecution of the case; the prosecution, so intended, includes every stage of prosecution from the beginning to the end of the case; hence the prosecution of this case includes the present exceptions. Nelson also objects that as he does not, the Territory cannot complain of the sentence. But it does not follow because he was satisfied with it that the Territory must· be. The right of the latter to accept is not dependent on his will; he has no voice in the proceeding; as a party his interests are not involved in, nor to be affected by it; hence he does not, and cannot appear here by attorney or counsel or in person; the only one who can appear here against the territory is an attorney appointed under section 147 by the judge who presided at the trial below, and at the expense of the county where the trial was had, and so appointed merely to aid this court in the elucidation of the principles which the exceptions involve.

The second exception. The territorial statute, approved. September 15th, 1877, entitled an act providing for the keeping of the territorial prisoners, and other purposes, declares in its section 1 that a given board shall " take charge of, and control all matters pertaining to the care and custody of territorial prisoners"; in its section 2, that the board shall ascertain the relative cost of keeping prisoners and transporting them to the territorial penitentiary located in Albany county; and to other prisons located without the Territory; and may " determine where the territorial prisoners shall be confined; and may make all contracts between the Territory and the authorities of such prisons, either in or out of the Territory; provided that the prisons selected shall be those in which the prisoners can be confined with the least expense to the Territory; that the penitentiaries or prisons so designated and selected

shall be territorial penitentiaries"; in its section 9, that the board shall notify the judges of the courts of the names and localities of the prisons designated by it as territorial prisons; and that the judges shall thereafter sentence convicts to imprisonment in such designated prisons; and in its section 12, that the board shall report its proceeding to the legislature at the next session. The residue of the act is subsidiary to and dependent upon the parts that I have set forth. Under this statute the board notified the judges of the first and second judicial district courts, that it had contracted with J. H. Stout, the warden and lessee of the Nebraska state penitentiary, which is above mentioned, for the confinement there of the convicts of the Territory, and had accordingly designated and selected that prison as the territorial penitentiary; and thereafter those judges sentenced and sent to that prison the territorial convicts who were subsequently convicted under them. The notice did not state, nor was by the statute required to state, the terms of the contract. The receipt of the notice made it the duty of the court to treat it as founded on a contract conforming to the act.

On the 13th day of December, 1879, an act of the legislature was approved, entitled "an act declaring the state penitentiary of the state of Nebraska a territorial penitentiary of the Territory of Wyoming"; and which declares that the state penitentiary of the state of Nebraska, located at Lincoln, in the state of Nebraska, is hereby declared to be a territorial penitentiary of the Territory of Wyoming, for the confinement of all convicts of said Territory of Wyoming, who have heretofore been sentenced, or may hereafter be sentenced, by any of the courts of said Territory of Wyoming, to imprisonment therein: which act is chapter 80, of the Statutes of 1879.

On the 13th day of December, 1879, there was also approved an act entitled, "an act providing for the keeping of territorial prisoners, and for other purposes connected therewith." The act in its 1st, 2nd, 3rd and 4th sections,

provides for a board of commissioners, to be appointed by the governor and council; invests it with the same powers to determine where the territorial convicts shall be confined; to contract for, select and designate prisons, in or out of the Territory, for their keeping, which are conferred by the act of 1877 upon the board created by that act, and subject only to the same conditions as to economy that was imposed on that board; declares that the prisons, so selected, shall be penitentiaries of this Territory, and requires that the board shall notify the judges of the names and locations of these prisons; and that the judges shall thereafter sentence to the prisons acccordingly. Sections 5 to 10, both inclusive, are subsidiary to and dependent upon the prior sections; and the remaining section 11, declares a repeal *in presenti* of all acts and parts of acts which conflict with this act. This is chapter 8, of the Laws of 1879.

The first board notified the legislature at its session of 1879, that it had contracted for, selected and designated the Nebraska prison as a territorial penitentiary; had notified the judges thereof; and that the latter had been sentencing to that prison accordingly: chapter 80 evinces and is based upon knowledge by the legislature of these facts. Chapter 81 repeals the act of 1877; but does not affect the contract which had been made under it. Chapters 80 and 81 being in *pari materia*, and approved together, are to be construed as one statute.

That part of the one statute which consists of chapter 80, confirms that contract; and upon it as a basis, declares that the Nebraska prison shall be a territorial penitentiary for past sentences to it, and until the selection and designation of another under that part which consists of chapter 81, for future sentences. The board contemplated by chapter 81, was filled at the session of 1879, and notified the judges in January following that it had contracted with said Stout, as the lessee and custodian of the Nebraska prison, for the confinement there of territorial convicts; and had accordingly selected and designated it as the ter-

ritorial penitentiary of Wyoming. Having received these notices as district judges, we take cognizance of them as members of this court.

The present sentence must find support, if any, in the contract of the new board, and this leads to an inquiry into the merits of the chapter. Its validity is asserted upon the grounds of the comity of law, the treaty power, constitutional expressions in several of the states of the Union, and a decision of the supreme court of the United States; also Federal provision under the treaty power. The territorial government has the right, and therefore the authority to punish its convicts: the one is the precise complement and measure of the other. The right is restricted and conditioned by the duty of care over the convict; and involves the control and custody of his person. Hence, in the case of a penitentiary offense, the government must transport the convict to prison, in order to secure to itself *nothing* less, and to the prisoner nothing more and nothing else than the sentence; must have charge of him there, and on the expiration of his sentence, must set him at liberty: to all which a valid sentence and process, continuing and operating in full force down to this point, are indispensable. In exercising its authority over him for punishment, it should have that reasonable regard to his wants which is consistent with the infliction of punishment and incident to humane and wise government; to accomplish it, must attend him throughout by its executive and judicial power. In respect to area, jurisdiction and territorial limits are identical: otherwise, as to area, jurisdiction—if not conferred and lost—would be unlimited, a thing in law impossible and absurd; hence all territorial government stops at the boundary; it has no extra territorial jurisdiction; at that line its coercive and protective power ends. This principle is inherent. In the case of *Albaman* v. *Booth*, and the *United States* v. *Booth*, in the 21 How. at p. 506, Taney, C. J.,° says at page 524: "No judicial process, whatever form it may assume, can have any lawful author-

ity outside of the limits of the jurisdiction of the court or judge, by whom it is issued; and any attempt to enforce it beyond those boundaries is nothing less than lawless violence "; Professor Cooley, in his work on Constitutional Limitations, at page 129, says "the legislative authority of every state must spend itself within the state." I quote these remarks, not because they propound a novel proposition, but because they are clear and forcible statements of a familiar principle; one of them made by an intelligent jurist, the other by a court of supreme authority to this court. In the light of this fundamental, infallible and uniform principle, the statute cannot be upheld.

Nor can it find support upon the idea that the convict has forfeited his rights, and retained no voice as to the place of his punishment. Were that so, he would have no voice as to the mode of his punishment. Neither proposition can be true: his conviction works no forfeiture or suspension of his rights, except so far as forfeiture on suspension is incident to punishment. If punished, the accused has a right to be punished according to law, and that involves, made with the conditions of time and place; he could not be convicted unless he was at the time subject to the territorial government, and it is bound to protect him in all those rights, which a lawful sentence leaves in him; subject to punishment he is entitled to protection; the right of punishment and duty of protection are inseparable, and a statute that ignores the latter, nullifies the former; conviction renders him powerless to protect himself and correspondingly dependent upon the government; it holds him absolutely in its hand, and must entreat him according to that law which is equally binding upon both. There can be no finer spectacle of good government than power so accurately applied to the suppression of crime as to vindicate law without violating right: there can be no more deplorable aspect of perverted authority than to make a victim of the accused in the name of justice.

It was urged that Nebraska does not dissent to the trans-

portation of our convicts over her territory nor to their punishment within her limits, and that her consent was to be presumed and *ex parte* Karstendick, 3 Otto, 396, was cited in support of the proposition. Though this case fails of showing assent, and there is no room for the presumption, and that citation does not support it, let the presumption be conceded the better to test the effect of such assent upon the statute which is under inquiry. The proposition proceeds upon the idea that the state has the power of assent. The principle is clear, that one state cannot convict and punish for crimes committed in another: on this ground one state cannot punish for convictions had in another. Park, C. C., 592; *The People* v. *Merrill*, 1 N. Y., 172; *Adams* v. *The People*, 2 Mich., 320; *Taylor* v. *The People*, 2 Mich., 472; *Bradley* v. *The People*, 11 Mich., 327; *Morrissey* v. *The People*, 16 Wis., 398; *State* v. *Mann* —Professor Cooley adds at the page last referred to in his work, " A state cannot provide for the punishment of acts committed beyond the state boundary as crimes, because acts, if offenses at all, must be offenses against the sovereignty within whose limits they have been done." This principle can be displaced, if at all, only by constitutional or statutory law, and there is no evidence of the existence of such law. Assume, however, that Nebraska has the power to assent. How does the power and its exercise aid the Wyoming act? The power and right of the Territory over its convicts is confined by the organic act to the territorial limits by the very prescription of the limits. The Federal government has not consented to the transportation of the convicts beyond those limits, but by prescribing the limits has required the convicts to be punished within them. Hence the consent of Nebraska is ineffective.

It is urged that, if a foreign prison cannot, the penitentiary in Albany county cannot be used by the Territory, because, owned and controlled by the Federal government, it, as much as the former, is beyond territorial jurisdiction. The cases are entirely dissimilar.

Under art. 4, sec. 3, subdv. 2, of the Constitution, empowering congress "to make needful rules and regulations respecting the territory of the United States," that government has placed the penitentiary at the use of the Territory, and in so doing, has exercised a supreme discretion: in that discretion it has provided the courts, in which felonies committed against the Territory, shall be prosecuted: in the same discretion has furnished facilities for punishing the convicts; and in punishing them has made it jurisdictional for the Territory to use them.

The organic act clothes the governor with unrestricted pardoning power as to territorial convicts; and neither can the legislature interfere with, nor can he divest himself of the prerogative, because it imposes a trust. The grant of a pardon is an executive order for the discharge of the convict; overrides all other power within the executive jurisdiction and may call upon that other power for support and enforcement; but it can be adequately enforced only within the Territory. Doubtless a pardon would be in a foreign jurisdiction the basis of ultimate relief; but it is inconsistent with the purpose and dignity of the prerogative, that its efficiency should depend upon the employment of foreign law. This statute assumes to nullify the prerogative. Cooley on Const. Lim. 116. Sustain the statute and the power is extinguished: sustain the power and the statute is void.

As then the comity of law is wholly unsuited to the relations of right and duty which the Territory occupies towards its convicts, it does not aid the statute.

Nor can support be found for it in the treaty power. If that exists as a state, it so exists because it is incident to state sovereignty, which is full, less what the state has relinquished to the Union. The state preceded the Union. The territorial status is created and measured by, and dependent on the will of the Union: if the power can be attached to a territory, it can be done only under the constitutional provision above referred to. It has not been

done. The Karstendick case,—Section 5539 of the U. S. Rev. Stat., first edition, provides that when an United States convict is imprisoned in a state penitentiary, "the criminal shall in all respects be subject to the same discipline and treatment as convicts sentenced by the courts of the state in which such penitentiary is situated; and, while confined therein, shall be exclusively under the custody of the officers having charge of the same under the laws of such state:" and sections 5541, 5542 and 5546 that convicts of the United States, whose punishment is imprisonment in a district where at the time of conviction there is no penitentiary, suitable or available for the confinement of convicts, shall be confined during the term of sentence in a suitable penitentiary in a convenient state, to be designated by the attorney-general, the use of which penitentiary is allowed by the legislature of that state for the purpose; and shall be transported or delivered to the warden or keeper of the penitentiary by the marshal of the district where the conviction is had: and section 5547, that "the attorney general shall contract with the managers or proper authorities * * * * * having control of such prisoners, (United States convicts), for the imprisonment, subsistence and proper employment of them, and shall give the courts, having jurisdiction of such offenses, (the offenses for which such convictions have been had) notice of the penitentiary where such prisoners shall be confined." Karstendick was convicted in the United States court in Louisiana, and sentenced for confinement for sixteen months in the penitentiary of West Virginia located at Moundsville in that state, under a notice from the attorney-general to the court, designating that prison as a penitentiary where such convicts should be confined; and was accordingly committed to the prison by the marshal of the district where the conviction was had: and then moved before the supreme court of the United States for a writ of *habeas corpus* with *certiorari*, upon grounds each of which was to the point that it did not appear by the record of his conviction that the steps had

been taken proper to authorize the sentencing court to sentence him to a penitentiary beyond the district of his conviction. The court overruled the objections, prefacing that part of its decision with the remark, that "It is conceded that congress has the power to provide that persons convicted of crimes against the United States in one state, may be imprisoned in another. Congress can cause a prison to be erected in any place *within the jurisdiction of the United States* and direct that all persons sentenced to imprisonment under the laws of the United States shall be confined there; or it may arrange with a single state for the use of its prison, and require the courts of the United States to execute their sentences of imprisonment within them."

The disjunctive "or," in this remark introduces an alternative, not to the idea of confinement within Federal jurisdiction, but to that of direction in one case as distinguished from arrangement in another, the alternatives being subject to the principle of that jurisdiction. Thus the court held the Federal statute to be valid, because it authorized the Federal courts to sentence for punishment in a state prison, located within the Federal jurisdiction. There can be no intelligent doubt of the correctness of the conclusion; for the jurisdiction embraces the Union area, and under those sections, Federal authority transports Federal convicts; can protect them from abuse there and secure to them due release on the expiration of their sentences, accompanies and surrounds them by its executive and judicial protection, and completely retains them within the reach of executive clemency. It does not or need not follow, it is true, from what I have quoted of the decision, that under those sections the Federal government could execute its sentences upon the convicts, so confined in state penitentiaries, and this for want of control over its convicts, while within them, and the sentences might fail of execution for want of rigid enforcement; but this would involve no invasion of the rights of the convicts, only a sort of relaxation or abatement of the prescribed punishment; the convict would be

protected by his, the government might suffer in its right. Thus the Federal statute was sustained on the principle that it provided for punishment within, and we are asked to sustain the territorial statute on the principle, that it provides for punishment without the jurisdiction; the case of Karstendick and the present case are antipodal, not parallel.

But as to the effect of the Federal statute, the court went farther in that case, and said: "It is farther insisted on behalf of the petitioner that the state of West Virginia has not given its consent to the use of the penitentiary of the state of West Virginia by the United States for the punishment of their criminals, and that for this reason the order for his confinement there is void. The petitioner is actually confined in the penitentiary and neither the state nor its officers object. Congress has authorized imprisonment as a punishment for crimes against the United States in the state prisons. So far as the United States can do so, they have made the penitentiary at Moundsville a penitentiary of the United States, and the state officers, having charge of it, their agents to enforce the sentences of imprisonment passed in their courts. The question is not now whether the state shall submit to the use of its property by the United States, nor whether those state officers shall be compelled to act as custodians of those confined there under the authority of the United States, but whether the petitioner can object, if they do not. We think he cannot, as the state permits him to remain in the prison as the prisoner of the United States, and does not object to his detention by its officers; he is rightfully detained in custody under sentence lawfully passed." Thus Karstendick did not question the right of the general government to contract with a state for the use of its prison and its prison officers, nor its power over the prison and its officers if a contract had been made; only that in his case a contract had not been made; and the court replied that West Virginia was permitting such use in his case, and its prison officers were acting accordingly,

and that was evidence that such contract had been made; and it seems to me that the court might have added, that back of that evidence was other, and of itself controlling evidence to the same effect, namely, that the attorney-general's designation to the sentencing court of the Moundsville prison was presumptive that he had made the requisite contract with that state. And in this particular that case essentially differs from the present one: in making the designation the attorney-general was acting but officially, not under personal interest, and did not occupy an attitude adverse to the presumption; in making the contract with the board, Stout acted as lessee, as well as custodian of the prison—under personal interest—and did occupy an attitude adverse to the presumption that Nebraska had authorized the contract.

The respect due from me to the United States supreme court permits the suggestion, that, as an open inquiry there is room for doubt, whether the use of a state prison, contemplated by this Federal statute, means a control by the Federal government of the interior of the prison for the enforcement of its sentences; and that to the extent of such control, the prison and the officers who are attached to it by the state, become respectively the prison and the agents of that government; for, to be such, they must be under its supervision and direction; whether by the provisions that Federal convicts while confined there, shall be in all respects subject to the same discipline and treatment which are applied to the state convicts who are confined there, and exclusively under the custody of the officers who have charge of the prison " under " which signifies, by and according to the laws of the state, the contract of the attorney-general—which must keep within the provisions— can do more than to put upon the given state the enforcement of the sentence through its prison and prison officers, over both retaining control, as to both being responsible to that government and standing between it and them accordingly. The inquiry, however, has ceased to be abstract, if

that court means what it says, its statement that the effect of the statute, through the contract, is to convert the state penitentiary into a Federal penitentiary and the state officers into Federal officers for the enforcement of Federal sentences, is a construction that transfers to that government that control for that purpose; so that it, not the state, in person punishes its convicts in the prison of the latter. Notwithstanding the explicitness of its expressions, I hesitate at the idea that the court intended to go so far. If, however, it did, under the statute that government retains its full coercive power over its convicts, strictly observing the jurisdictional condition. In this view the Karstendick case becomes a complete authority against ch. 81.

In support of the judgment we are reminded that the United States has acquired within the limits of several foreign governments, territorial areas for the purpose of its diplomatic service with those governments; which areas are appropriated to the use of its legations, located at those governments; and over which areas it exercises criminal jurisdiction to convict and punish within them. This is an additional illustration that the general government confines the exercise of its primitive power to its limits, whether at home or abroad; and that its practice lucidly and forcibly condemns the departure which this territorial legislature attempts to inaugurate.

In this connection the English and French practice as closely conformable to the jurisdictional principle, is instructive. Foreign transportation, as a method of punishment, is unknown to the British courts: in them a convict transportation "beyond the seas," has never meant more than transportation in British bottoms—which are British territory—from one part to the other of the British realm. Convict transportation in the French court has never meant more than the transportation in French ships—which are French soil—from one to another part of the French dominion.

The history of civilized governments presents no instance

to the contrary, except in the case of several of the American territories. The principle belongs to the common law, but also to general civilization. In support of the judgment provisions have been produced from the constitutions of several of the states of the Union against foreign convict transportation, upon the proposition that a preventive clause in a constitution recognizes, as inherent in the government or sovereignty, the thing prevented, in the absence of prevention : but I do not accept that proposition as a correct rule of constitutional interpretation; the true, broader and more useful one is, that the office of a constitution is to define and formulate a government and its powers ; and hence constitutional provisions create, inhibit, enlarge, restrict, declare according to the aim which is to be accomplished ; so that in the abstract, the provision relied upon can be quoted no more as restrictive than as declaratory; but in fact preceded by a principle of the common law, which is to the same effect, they are declaratory.

In support of the judgment, provisions from the constitutions of several other of the states of the Union, recognizing exile as a form of punishment, have been produced. But chapter 81 does not contemplate expatriation; nor does the judgment attempt to inflict it. Consider, however, that method as analagous to transportation. The learned counsel has failed to suggest an instance in our judicial history, in which punitive expatriation has been imposed in this country; and I feel safe in asserting that none exists. Those provisions are probably mere relics repeated from colonial charters and statutes; are unaccompanied by judicial sanction, and stand in the constitutions that contain them, as political abstractions, or effete ideas. I am not prepared to admit that punitive expatriation is an incident of state sovereignty in the Union; it is not recognized in the Federal practice, and cannot be regarded as an incident to the territorial status, for it is an incident in the latter, if it is there.

Chapter 81 forcibly illustrates the error of its principle,

which it aggravates to the extreme. It authorizes the board to contract in its absolute discretion for a home or a foreign prison, provided the selection subjects the Territory to the least expense in the punishment of its penitentiary convicts. The rule of economy is the only limitation upon the power of the board to select, and is as much a condition of duty as a restriction upon authority. It may as validly contract with the most remote state in the Union, as with Nebraska; with the most remote government without, as with a state within the Union; with a barbarous as with a civilized power. The amplitude of the power, and the complications of its exercise expose the trust to easy and elusive abuse, and the statute has provided no method for ascertaining or preventing abuse,—actually renders the action of the board impossible. Upon the same principle the territorial government might arrange for the execution of its capital convicts without its limits. It would be a singular but a consistent stretch of legislation.

The second exception presents several constitutional questions which I have passed over, deeming them too grave to be disposed of without further argument.

The first exception. Chapter 81 closely conflicts with the Federal legislation respecting the penitentiary which is located within the Territory. The United States Revised Statutes, title twenty-third, "the territories," provide in section 1892 that every penitentiary in an organized territory shall be under the care and control of the marshal of the territory; in section 1893, that "the attorney-general of the United States *shall* prescribe all needful rules and regulations for the government of" the penitentiary; and the marshal shall cause them to be observed; and in section 1895, that "any person convicted by a court of competent jurisdiction in a territory, for a violation of" its laws, "and sentenced to imprisonment, *may*, at the cost of such territory, on such terms and conditions as *may* be prescribed by such rules and regulations, be received, subsisted and employed in such penitentiary during the term of their

confinement, in the same manner as if he had been convicted for an offense against the laws of the United States." By statute, full, explicit and in force on the 15th day of December, 1879, this Territory had accepted that use of the Federal penitentiary, located within it, and provided for the consequent expense; the district courts of the Territory sentenced, and committed to that prison accordingly; and it was at that date the lawful penitentiary of the Territory for territorial cases. That the Federal law was, and is permissive to this extent, is indubitable, but it was and is also imperative. What is the meaning of "may," where it first occurs in the quotation from section 1895? In statutory construction the term is to be read as permitting or directing according to context and purpose: and hence in the quotation as "shall." Section 1893, in requiring the attorney-general to prescribe rules and regulations, says that he "shall" prescribe them; section 1895, in providing for the use of the penitentiary for territorial convicts, and at the cost of the Territory, requires it to be on the terms and conditions which "may" be prescribed, etc. "May" necessarily meaning "shall," that the section may be consistent—otherwise what 1893 commands him to do, he may under 1895 elect to do: the word "may" is repeated in the same sentence in the quotation from section 1895; and as the context employs it imperatively where it secondly occurs, it is open to the presumption that it so uses it where it first occurs. The purpose of the Federal act requires that it shall be so read. The Constitution puts upon the general government the care of the territories, creates between them the relation of guardian and ward; section 1895 is a declaration by that government that it was needful to the Territory—that a penitentiary within it was needful to it—a need of which that government was the supreme judge: a Federal statute, relating to a territory, because passed in the execution of that trust, because it can be passed only under this constitutional requirement, and because it is an expression by the controlling will that

it is necessary to the proper care of the Territory, is presumptively imperative; and must so operate, unless the text and the purpose call for a permissive construction. The court might, therefore, stop here, and declare the section to be imperative, because there is nothing in the text or purpose to indicate that it is permissive. But further consideration confirms this view. A penitentiary was indispensable to the machinery of the territorial government; when the present one was built, the Territory was in its infancy; its population numbered but about nine thousand, and was sparse and shifting; its taxable property was small in amount; it was large in area, rich in resources, located upon the route of trans-continental and inter-oceanic traffic, and capable of and promising a large and prosperous expansion; a suitable penitentiary would be one built not merely for present, but also for future wants; and built upon the idea of permanency: economy forbade the erection of several; required the erection of one—and that one for the joint use of the two governments: the Territory was unequal to the erection of one suitable for its own wants; its necessities and its inability were known to the general government, and constituted an especial appeal to its case; that government must supply the want, or the Territory be left unprovided for; that government built the present penitentiary far in excess of its own present, or, so far as they could reasonably anticipate, its own future wants, but fully adapted to the permanent use of both governments; and forthwith devoted it, and has ever since kept it open to the use of the Territory; and upon the simple and just condition that the latter should, for that use, contribute to its support. It would be insensible to conclude that the general government, having incurred the expense of the erection principally for the benefit of the Territory, intended to leave it to the latter to use the institution or not, to share in its maintenance or not, at will. I am forced to conclude that the former, having the power to protect itself against an abuse of its case, and to do this without injustice, in-

tended to exercise the power by devoting the use of the prison to the Territory; and did exercise it through section 1895 as a requirement that it should use the prison, and should pay such price for the use as that government, in the exercise of its supreme discretion, might deem proper. I therefore hold that this section makes the Federal penitentiary, now located in Albany county, the territorial penitentiary, to which alone territorial convicts, in cases of felony, should be sent, and to which, therefore, Nelson should have been sentenced. This limitation to cases of felony arises from the fact that the common law, in punishing misdemeanor by confinement, imprisons in the county jail; and the Federal act indicates no intention to affect the common law in this particular.

With the exception of its repealing effect chapter 8 is invalid: the judgment of the district court conflicts with Article V, of the constitutional amendments, which forbids that any person shall be deprived of his liberty without due process of law; and each of the exceptions was well taken.

Judgment accordingly.